IN THE UNITED STATES DISTRICT COURT IN AND FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case No.:  14-23285-CIV-MORENO/O'SULLIVAN

TRUDY MIGHTY, as Personal Representative of the
Estate of DAVID N. ALEXIS, deceased,

                Plaintiff,

vs.

MIAMI-DADE COUNTY, a Political Subdivision of the State
of Florida; MIGUEL CARBALLOSA, in his Individual and
Official Capacity as Miami-Dade County Police Officer,

                Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiff, TRUDY MIGHTY, as Personal Representative of the Estate of DAVID N. ALEXIS, deceased, by and through her undersigned counsel, hereby sues Defendants MIAMI-DADE COUNTY, a Political Subdivision of the State of Florida; and MIGUEL CARBALLOSA, in his Individual and Official Capacity as a Miami-Dade County Police Officer, and alleges:

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

1.      This is an action for money damages in excess of $75,000.00, exclusive of costs and interest, brought pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and under the Constitution and Laws of the State of Florida, against MIAMI-DADE COUNTY and Miami-Dade County Police Officer, MIGUEL CARBALLOSA, arising out of the incident and conduct of Police Officer MIGUEL CARBALLOSA described herein on or about October 2, 2012, during which David N. Alexis ("David Alexis") was fatally shot by the use of excessive deadly force.  Police Officer MIGUEL CARBALLOSA unlawfully and unconstitutionally

assaulted, battered, shot, and killed David Alexis, causing his wrongful death. Defendants failed to prevent the occurrence of these constitutional violations.

2.    This is further an action against MIAMI-DADE COUNTY, Florida, as its Strong Mayor and Board of County Commissioners were official and final policymakers for MIAMI-DADE COUNTY and the Miami-Dade Police Department. At all times material hereto, the Strong Mayor and Board of County Commissioners spoke with final policy-making authority for MIAMI-DADE COUNTY, and MIAMI-DADE COUNTY was responsible for the conduct, training, and supervision of the police officers of Miami-Dade County's Police Department, including without limitation, conduct, training and supervision related to the following: effective communication with law abiding citizens; shooting citizens in the back; appropriate methods for use of force; appropriate methods for conducting surveillance; appropriate methods for tracking; appropriate uniforms for on duty assignments and appropriate methods for identifying oneself as a Miami-Dade County Police Officer; appropriate methods for conducting a stop of a citizen; appropriate methods for detaining suspects; appropriate methods for conducting undercover investigations; appropriate use of firearms; appropriate methods for taking individuals into custody; and appropriate methods of effectively implementing a system to monitor acts of excessive force conduct by police officers and acts of fatal excessive force conduct by police officers in order to identify police officers who were unfit or required additional training to remain on active duty and/or to use firearms.

3.      At all times material hereto, Plaintiff, Trudy Mighty, as the Personal Representative of the Estate of David Alexis, deceased, was and is a resident of Miami-Dade County, Florida, and is otherwise *sui juris*.

4.       At all times material hereto, Plaintiff, Trudy Mighty, was and is the duly appointed Personal Representative of the Estate of David Alexis, deceased, and is the proper party to bring this action.

5.      At all times material hereto, Teyliah Alexis, whose date of birth is January 6, 2007, was and is the minor daughter of David Alexis and his sole statutory survivor, pursuant to § 768.18, Florida Statutes.

6.      At all times material hereto, Defendant, MIAMI-DADE COUNTY, was a political subdivision of the State of Florida, organized and existing under the laws of the State of Florida. MIAMI-DADE COUNTY, acting through its Governmental Subdivision, Miami-Dade Police Department, was responsible for, among other things, "promot[ing] a safe and secure environment, free from crime and fear of crime" in Miami-Dade County.

7.      At all times material hereto, the official and final policy makers of MIAMI-DADE COUNTY were the Miami-Dade County Strong Mayor and/or the Miami-Dade County Board of County Commissioners ("official and final policy makers").

8.      At all times material hereto, Defendant, MIGUEL CARBALLOSA ("OFFICER CARBALLOSA"), in his individual capacity and as an officer of the Miami-Dade Police Department, was a sworn Miami-Dade County Police Officer acting under color of law.

9.      At all times material hereto, Defendant, OFFICER CARBALLOSA, and other Miami-Dade County Police Officers at or near the scene of the subject fatal shooting, were acting within the course and scope of their employment as Miami-Dade County Police Officers and acting under color of law. Between 2005 and 2013, there were 12 complaints against or use of excessive force investigations of OFFICER CARBALLOSA, including three fatal contact homicide shootings, none of which resulted in any consequences being applied to OFFICER CARBALLOSA by the official and final policy makers or Miami-Dade County's Police Department. In OFFICER CARBALLOSA's fatal contact homicide shootings, he reportedly acted with other RID officers. Here, after OFFICER CARBALLOSA shot and killed David Alexis, MIAMI-DADE COUNTY reported to the public that multiple detectives were present at the time of the incident, however, the Defendants have identified only OFFICER CARBALLOSA as the sole RID officer present at the time David Alexis' was killed.

10.      At all times material hereto, Miami-Dade Police Department was a Governmental Subdivision of MIAMI-DADE COUNTY with its headquarters at 9105 N.W. 25th Street, Doral, Florida, and was duly organized and existing under the laws of the State of Florida. MIAMI-DADE COUNTY is charged with and responsible for the operation of the Miami-Dade Police Department, including without limitation, appointment, training, promotion, and supervision of members of the Miami-Dade Police Department, which includes providing training, instruction, discipline, control, and evaluating conduct of the Miami-Dade Police Department and its personnel.

11.     At all times material hereto, MIAMI-DADE COUNTY had the power, right, and duty to control the manner in which its officers carried out the objectives of their employment and to ascertain that all orders, rules, instructions, and protocols of the Miami-Dade Police Department were consistent with the Constitutions, statutes, ordinances, regulations, customs, policies, usage, and laws governing the State of Florida and the United States.

12.     Pursuant to § 768.28, Florida Statutes, the State of Florida, for itself and for its agencies and subdivisions, has waived its sovereign immunity in tort actions such as this, in which personal injury and related damages resulted from the negligence or a wrongful act or omission of employees of the agency or subdivision while acting within the scope of their office or employment under circumstances in which the State of Florida or such agency or subdivision, if a private person, would be liable to the claimant under the general laws of the State of Florida.

13.     All notice requirements and conditions precedent to the bringing and maintenance of this action have been performed, occurred, or have been waived, including the notice requirements set forth in § 768.28, Florida Statutes.

14.     This action is based on the individual and concerted conduct of the named Defendants in utilizing the police power of the State of Florida to deprive David Alexis of his constitutional and civil rights. This conduct violated David Alexis' rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, sections 2, 9, 12, and 17 of the Florida Constitution, as well as the statutes and laws of Florida.

15.     The violations described in this Complaint resulted from the policies, customs, patterns, and practices of the named government agencies and their employees, and at all times material to this action, all of the named Defendants acted under color of state or local law.

## FACTUAL ALLEGATIONS

16.     On or about October 2, 2012, David Alexis was 26 years of age and left his place of employment at North Shore Hospital in the evening, and drove his car to his parents' home, located at 1451 N.W. 113th Terrace, Miami, Florida.

17.     At that time and place, David Alexis exited his car in front of his parents' home in order to unlock and open the gates of the driveway and drive his car within the gate on his parents' property, when he was confronted by OFFICER CARBALLOSA, who for some unexplained reason, chose to park his unmarked white pick-up truck across the street from the Alexis family home.

18.     At that time and place, unbeknownst to David Alexis, the occupant of the unmarked white 2003 Chevrolet pick-up truck, included OFFICER CARBALLOSA, who it is believed was an undercover police officer assigned to the Robbery Intervention Detail Unit (hereinafter "RID") of the Miami-Dade Police Department.

19.     RID is a specialized unit with the stated purpose of identifying locations and subjects based upon recent reported crimes and to focus their resources on these subjects and locations so that the opportunity to commit the crime of robbery is reduced.

20.     There had been no reason for RID to suspect that David Alexis was engaged or had been engaged in prior robberies to justify the surveillance that was occurring outside of the Alexis family home.

21.     While David Alexis stood at or near his car in front of his parents' home, OFFICER CARBALLOSA shot and killed him. There were a number of shots fired, including numerous shots in the back as David Alexis attempted to turn around and go inside his parents' house. David Alexis may have been shot, or shot at, by other unidentified police officers on the scene as well.

22.     At no time did David Alexis engage in conduct that would have justified the Defendants' use of unreasonable, excessive, and deadly force against him.

23.     Before his death, David Alexis experienced significant pain and suffering from the shots fired by OFFICER CARBALLOSA. After the shooting and prior to his death, David Alexis was denied reasonable medical care and assistance by OFFICER CARBALLOSA, and potentially others on the scene who were capable of providing necessary medical care and assistance.

24.     At the time of his death, David Alexis had not been placed under arrest, or was even subject to arrest, because he had done nothing wrong and was merely an innocent civilian exiting his car in front of his parents' home.

25.     As a direct and proximate result of the aforesaid conduct by the Defendants, and described herein, David Alexis was wrongfully killed on October 2, 2012.

26.     Furthermore, the Policy Manual of the Miami-Dade Police Department at the time of the shooting allowed the use of deadly force against unarmed persons if the police officers had a reasonable belief that they or another person were in imminent danger of death or serious bodily harm.

27.     The Miami-Dade Police Department allowed police officers to utilize deadly force based upon a reasonable belief, instead of the constitutionally required probable cause.

28.     Miami-Dade Police Department officers have engaged in a custom, policy, and practice of using excessive and deadly force against unarmed persons in situations in which the use of such force is unnecessary and excessive, thereby subjecting the public, including David Alexis, to violations of clearly established constitutional rights protected by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the comparable provisions of the Florida Constitution.

29.     The use of unlawful excessive and deadly force such as was used against David Alexis was not an isolated incident and was consistent with the institutionalized custom, policy, and practice as described herein of Miami-Dade County's Police Department.  MIAMI-DADE COUNTY's official and final policy makers, as described herein, and Miami-Dade County's Police Department, were on subjective and actual notice of such practices, and condoned such violations by not disciplining officers who engaged in such use of excessive and deadly force, and at times rewarded and promoted them. This created a culture where there was no oversight with accountability implemented and sent the message to the police that they need not worry about the

Case 1:14-cv-23285-FAM   Document 89   Entered on FLSD Docket 10/03/2016   Page 9 of 74

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 9

improper or unlawful use of excessive force because they would not be held accountable. MIAMI-DADE COUNTY's official and final policy makers, as described herein, and Miami-Dade County's Police Department, failed to take corrective action to create a bona fide and meaningful system of addressing the unlawful use of excessive and deadly force by Miami-Dade County Police Officers, including without limitation, the unlawful use of excessive and deadly force by OFFICER CARBALLOSA. MIAMI-DADE COUNTY's official and final policy makers had, **prior** to the fatal shooting of the decedent, David Alexis, on October 2, 2012, **subjective and actual notice** of Miami-Dade County's Police Department's institutionalized custom, policy, and practice of the use of unlawful, excessive and deadly force, such as was used against the decedent, David Alexis, and Miami-Dade County's Police Department's lack of any oversight to address the use of unlawful, excessive and deadly force with appropriate accountability implemented, such as occurred with respect to OFFICER CARBALLOSA, as described herein by and through the following:

(a)     Miami-Dade County Police Department's press releases;

(b)     Press reports in local and national press in video, printed press and electronic press formats;

(c)     Miami-Dade County internal and inter-agency communications;

(d)     "News Releases" posted on the miamidade.gov website for Miami-Dade County related to police shootings;

(e)     Miami-Dade County's excessive force and homicide investigations conducted by members of the same agency accused of excessive force, i.e., Miami-

Case 1:14-cv-23285-FAM   Document 89   Entered on FLSD Docket 10/03/2016   Page 10 of 74

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 10

Dade Police Department investigated itself without any resulting discipline for many years, and the Strong Mayor, as Mayor and a Miami-Dade County Commissioner, knew that an agency such as the Miami-Dade Police Department should not conduct investigations of itself because it would be "akin to the fox guarding the hen house";

(f)     Miami-Dade County's Police Department's investigations of police shootings of citizens were performed at a glacial speed, regularly taking from two to five years to complete with the knowledge that the wrongful death statute of limitations in the State of Florida is two years and that police officers such as OFFICER CARBALLOSA would continue in their same position while under investigation and would likely be involved in another unlawful police shooting of a citizen during the ongoing investigation of the prior unlawful police shooting;

(g)     Reporting from and communications within the Miami-Dade Board of County Commissioners' Health and Public Safety Committee and perhaps other committees of the Miami-Dade Board of County Commissioners and in particular reporting of incidents of police shootings;

(h)     Miami-Dade County's risk management division and its procedures of investigating claims, including without limitation, investigations pursuant to receipt of notice letters by the Miami-Dade County Mayor from potential plaintiffs in compliance with the "notice requirements" and conditions precedent to the filing of an action and claims related thereto for unlawful, excessive or deadly force by a Miami-Dade County Police Officer set forth in § 768.28, Florida Statutes;

(i)      Lawsuits or complaints filed in Miami-Dade County Circuit Court and the United States District Court for the Southern District of Florida alleging the use of excessive force by Miami-Dade County Police Officers; and

(j)      Citizens' complaints of unlawful, improper, unnecessary, and excessive use of force against persons and citizens whom Miami-Dade County Police come in contact with and who posed no threat of serious bodily injury or death to the Miami-Dade County Police or the public.

30.      At all times material hereto, Miami-Dade Police Department failed to adequately train, supervise, and control its officers, including OFFICER CARBALLOSA, in the proper use and application of appropriate force and deadly force, and the MIAMI-DADE COUNTY official and final policy makers were aware of and condoned the practices described herein. The failure to properly train includes without limitation: the failure to correctly instruct on the applicable law, rules, and procedures concerning the lawful use of force and deadly force; the failure to take corrective or disciplinary action upon notice of unlawful actions, conduct, or practices; the failure to create a bona fide and meaningful system of addressing the unlawful use of excessive and deadly force by Miami-Dade County Police Officers; and retaining, rewarding, and promoting officers who were known to have unlawfully used excessive and deadly force. This resulted in a Miami-Dade County Police Department *de facto* policy of the unlawful and unnecessary use of excessive and deadly force against citizens, such as David Alexis.

31.      As a direct and proximate cause of the acts of OFFICER CARBALLOSA, MIAMI-DADE COUNTY, and Miami-Dade County Police Department, described herein,

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 12

David Alexis suffered violations of his constitutional rights protected by the United States and Florida Constitutions, severe pain and suffering, and loss of life.

32.     The actions of OFFICER CARBALLOSA, MIAMI-DADE COUNTY, and Miami-Dade Police Department described herein violated the clearly established and well-settled federal constitutional rights of David Alexis of which a reasonable person would have known, including without limitation, freedom from cruel and unusual punishment, equal protection under the law, freedom from the unreasonable seizure of the person, freedom from the use of excessive force, and freedom from the use of unjustified deadly force against the person when David Alexis was shot and killed on October 2, 2012 by OFFICER CARBALLOSA.

## COUNT I  (42 U.S.C. §1983 Claim)
### MIAMI-DADE COUNTY

33.     Plaintiff re-alleges paragraphs 1 through 32, inclusive, as if set forth herein and further alleges as follows.

34.     This action against MIAMI-DADE COUNTY is brought by Trudy Mighty, as the Personal Representative of the Estate of David Alexis, deceased, for the excessive use of force, assault, and battery on David Alexis, a 26-year-old man of Haitian descent, conduct that violated clearly established law, including the constitutional rights of David Alexis.

35.     The shooting of David Alexis was unjustified by any actions or conduct of David Alexis, who was unarmed, and the shooting death of David Alexis constituted an unreasonable and excessive use of force.

36.     The shooting of David Alexis was the result of conduct that was recklessly, maliciously, or deliberately indifferent to David Alexis, in depriving him of his constitutional rights.

37.     At all times material hereto, Defendant, OFFICER CARBALLOSA, and other Miami-Dade County Police Officers, at or near the scene of the subject fatal shooting, were acting under the color of law as authorized officers and agents of MIAMI-DADE COUNTY, and while in purported furtherance of their official duties, caused deprivation of constitutional rights of David Alexis under the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and the comparable provisions of the Florida Constitution by shooting and killing David Alexis while he was unarmed; by shooting David Alexis in the back; by continuing to shoot David Alexis in the back as he was trying to get into the family home gated area and the family home; and denying David Alexis reasonable medical care and assistance after shooting him.

38.     Prior to and including October 2, 2012, and at all times material hereto, the official and final policy makers of MIAMI-DADE COUNTY were the Miami-Dade County Strong Mayor and/or the Miami-Dade County Board of County Commissioners ("official and final policy makers").

39.     Prior to and including October 2, 2012, and at all times material hereto, MIAMI-DADE COUNTY, by and through their official and final policy makers, as described herein, developed unofficial policies, customs and practices exhibiting deliberate indifference to the constitutional rights of their citizenry, that were the moving

Case 1:14-cv-23285-FAM Document 89 Entered on FLSD Docket 10/03/2016 Page 14 of 74

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 14

force behind the deprivation and violation of constitutional rights as described herein of David Alexis when he was killed on October 2, 2012.

40. Prior to and including October 2, 2012, and at all times material hereto, MIAMI-DADE COUNTY had a history of deeply rooted, longstanding, and widespread abuse in the areas of excessive force, deadly force, and overall police misconduct that put their official and final policymakers on subjective and actual notice of the need for training, improved training, supervision, and discipline of its officers, including OFFICER CARBALLOSA and other Miami-Dade County Police Officers at or near the scene of the subject fatal shooting of David Alexis.

41. Prior to and including October 2, 2012, and at all times material hereto, MIAMI-DADE COUNTY, by and through its official and final policy makers had **subjective and actual knowledge** of the risk of serious harm related to repeated constitutional violations by acts of unlawful, excessive, and deadly force by its police officers, and made conscious choices to ignore these risks. The official and final policymakers tolerated, condoned, and ratified the excessive force and police misconduct by the Miami-Dade County Police Department officers, including that of OFFICER CARBALLOSA. MIAMI-DADE COUNTY failed to impose any meaningful training or retraining programs; failed to impose any meaningful discipline upon Miami-Dade County's Police officers; ratified the unlawful, excessive, and deadly force through toleration, bestowment of recognition on officers that encouraged repeat actions of unlawful, excessive and deadly force, and promotion of their police officers' conduct; and effectively "encouraged" and fostered the use of unlawful, excessive, deadly force

and police misconduct. As a result of the repeated acts by the official and final policymakers of MIAMI-DADE COUNTY, the following unofficial policies, customs and practices were implemented that were the moving force behind the constitutional violations alleged herein and suffered by David Alexis on the night of October 2, 2012:

(a)     An unofficial policy, custom or practice permitting the use of unlawful, excessive, deadly force, and police misconduct within the Miami-Dade Police Department, and in particular in the absence of the constitutionally required existence of objective probable cause;

(b)     An unofficial policy, custom, or practice of ratifying and approving unreasonable shootings of citizens or persons by Miami-Dade Police Department officers by failing to implement methods necessary to prevent such shootings, failing to conduct meaningful investigations with the intent to seek the truth that are necessary to prevent such shootings, and failing to provide the training or retraining necessary to prevent such shootings;

(c)     An unofficial policy, custom or practice of failing to discipline Miami-Dade Police Department officers who use unlawful, excessive, or deadly force improperly, who unreasonably shoot persons or citizens, and at times rewarded and promoted officers who used unlawful, excessive, or deadly force;

(d)     An unofficial policy, custom or practice of failing to properly train or retrain Miami-Dade Police Department police officers in the proper and legal use of force, including, excessive and deadly force;

(e)     An unofficial policy, custom, and practice of inadequately investigating citizen complaints of Miami-Dade Police Department officers' misconduct leading to a widespread atmosphere of ratification, tolerance, and culture of accepting the use of unlawful excessive force, deadly force and police misconduct; and

(f)     An unofficial policy, custom, and practice of inadequately training, supervising and disciplining Miami-Dade Police Department officers by not requiring appropriate in-service training and/or retraining of officers known to have engaged in excessive force, deadly force, or police misconduct.

42.     The above unofficial policies, customs, and practices were implemented by the official and final policy makers of MIAMI-DADE COUNTY, by virtue of the following:

(a)     Accepting without question inadequate investigations into complaints of police misconduct, excessive force and deadly force for many years, including without limitation, 1991 through 2012, that were characterized by the following: the use of leading questions to officers in the limited sworn statements of police that were taken; the use of press releases and interviews provide with the intent to exculpate the Miami-Dade County Police Officers; non-objective, biased self-investigations or investigations conducted by co-workers; conducting investigations with the primary goal of exculpating the Miami-Dade Police Department officer involved in the shooting and/or excessive force, rather than seeking the truth and to correct unacceptable conduct by said police officer; taking enormous time periods, such as two to five years, to complete investigations of unlawful use of excessive force or deadly force; taking sworn

statements of witnesses prior to taking Miami-Dade County Police Department officers' sworn statements; taking sworn statements of Miami-Dade County Police Department officers only after review of available audio or film of the incident; taking Miami-Dade County Police officers' statements after a significant period of time had elapsed after the incident; refusing to allow any representative from the Florida State Attorney's Office to be present for any Miami-Dade County Police officers' sworn statements about police shootings of citizens; advising citizens or complainants that their statement could be used against them for criminal sanctions; and by pre-interviewing Miami-Dade County Police officers prior to recording their sworn statements in connection with excessive force complaints and shootings of citizens;

(b)     The failure to retrain, discipline, or terminate few, if any, Miami-Dade County Police officers for the use of excessive force for over 20 years when such was necessary to preserve and protect the constitutional rights of the citizens of Miami-Dade County;

(c)     The failure to discipline Miami-Dade County Police officers for not being truthful concerning their use of excessive force for over 20 years and for filing fraudulent charges against citizens;

(d)     The failure to take appropriate action after having actual or subjective knowledge of 250 fatal shootings by Miami-Dade County Police officers since 1979;

(e)     The failure to take appropriate action for decades after having actual or subjective knowledge of the use of excessive force or deadly force involving hundreds of citizens and complainants including, without limitation, the following 60 citizens[1]:

    i.     **Almeciga, Steven - Date of Incident: November 1, 2001.**

Almeciga, a 34-year-old husband and father of three minor children, was killed by unlawful acts of Miami-Dade County Police Officers after the police had been called out for a domestic dispute. When the police approached Almeciga at his home, he was alone and **unarmed**. The police conferred with Almeciga's wife waiting across the street and became aware that Almeciga posed no threat whatsoever to the police or anyone else. Despite this understanding, the officers entered Almeciga's home and immediately physically attacked him. The police struck him and placed him in a chokehold around his neck. Almeciga indicated to the police that they were injuring him, that he could not breathe, and that he would not resist, and yet the police refused to remove the chokehold. Almeciga died.   The police misrepresented what happened in the public records. *Almeciga v. Miami-Dade Cnty.*, No. 03-22807-Civ-Huck/Turnoff (S.D. Fla. 2003) [D.E. 48, p.1- 2].

    ii.     **Andrew, Antonio Lee - Date of Incident: June 30, 2011.**

36-year-old Andrew and several other men were deliberately executed by 13 Miami-Dade County Police Officers after the group approached a county-owned home during a marijuana sting operation. The Miami-Dade County Police Department **robbery division** conceived the sting. At the time of this incident, Miami-Dade County Police Officers from the Street Terror Offender Program or Special Response Team

---

[1] The names of the Miami-Dade County Police officers involved in the incidents described in paragraph 42(e)(i) through (lx) have been omitted with the exception of the Defendant, MIGUEL CARBALLOSA.

Case 1:14-cv-23285-FAM   Document 89   Entered on FLSD Docket 10/03/2016   Page 19 of 74

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 19

were **"dressed completely in black,"** and "none had badges displayed and there were **no marked police cars on the scene**." "Andrew's body was littered with bullets, including **bullet holes in his open hands and back**." "At the time the officers shot Andrew, he did not pose an immediate threat of death or physical harm to any of the officers as Andrew was attempting to run away, he not raise his firearm and did not discharge a bullet. At the time the officers shot Andrew, Andrew had no idea these shooters were police officers, and in reasonable fearing for his own safety, Andrew ignored the command by the officers to go to ground, instead opting to flee the scene." Infrared video reflects that Andrew had complied with the police order to lie on his back with arms spread before he was shot. Two years after the killings, one of the Miami-Dade County Police Officers involved, was **promoted** to major and head of the Miami-Dade County Police Department's homicide division. *Benbow v. Miami-Dade Cnty.*, No. 13-cv-20452-GRAHAM (S.D. Fla. 2013) [D.E. 50, p.1-9] (emphasis added); *Miami-Dade Police Needs to Change Sting Policies, Panel Says*, NBCMIAMI NEWS, Apr. 15, 2015, http://www.nbcmiami.com/news/local/Miami-Dade-Police-Needs-to-Change-Sting-Policies-Panel-Says-298980091.html.

iii.   **Azcuy, Sergio - Date of incident: May 17, 2012.**

Miami-Dade County **Robbery Intervention Detail (RID)** Police Officer shot and killed 46-year-old Azcuy after staging an accident scene. The **RID officer** claimed he saw "a dark colored object" in his hand.  Azcuy was the passenger in a green Kia caught in a narcotics trafficking sting. The vehicle's occupants were ordered to show their hands. The driver complied, but Azcuy is said to have made an evasive move, and officers claimed they perceived a dark shiny object in his right hand. Azcuy was shot and killed by the **RID officer**.  **Azcuy had no gun** and

was actually holding a cell phone. *One Dead in Police-Involved Shooting in Miami-Dade*, NBCMIAMI NEWS, May 18, 2012, http://www.nbcmiami.com/news/local/Police-Involved-Shooting-in-Miami-Dade-151919695.html; David Ovalle, *Documents detail Miami-Dade undercover operation leading to fatal shooting*, THE MIAMI HERALD, June 30, 2012, http://www.miamiherald.com/latest-news/article1940932.html.

iv. **Barnes, Eduardo - Date of Incident: March 26, 2012.**

Two **Robbery Intervention Detail (RID)** Miami-Dade County Police Officers, "[w]ithout probable cause, reasonable, suspicion, without ascertaining themselves of required licenses ... or justification whatsoever, ... **without its sirens or police lights** on (**in the unmarked police car**), approached Barnes at approximately 40 miles per hour. Barnes was scared and ran to a lot adjacent to 926 NW 69 Street Miami, Florida. The **RID officers at no point identified themselves as police officers**; rather, they (the officers) ran towards Barnes and shot Barnes in the leg. After the officers shot Barnes in the leg, Barnes fell to the ground, and the **RID officers** again **shot Barnes in his back** for no justification whatsoever, and **while Barnes laid on the ground posing no threat whatsoever**. The officers ran towards Barnes and shot Barnes again in the left side, penetrating the skin and shattering his jaw." *Barnes v. Miami-Dade Cnty*., No. 1:13-cv-20778-Lenard/O'Sullivan (S.D. Fla. 2013) [D.E. 1, p. 2] and [D.E. 18, p. 2] (emphasis added).

v. **Baker, Randy - Date of Incident: October 24, 2004.**

Baker was 49 years old, a United States Army Veteran who served his country from 1973 to 1978 and received an Honorable Discharge, and suffered from schizophrenia at the time of the incident. Witnesses

Case 1:14-cv-23285-FAM   Document 89   Entered on FLSD Docket 10/03/2016   Page 21 of 74

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 21

observed as he lay on the ground and was **shot in the back of the head**. Baker, an African-American male, was killed by multiple gunshots intentionally fired by a Miami-Dade County Police Officer into the decedent's head and chest. The shooting was unreasonable in that at the time of the shooting, the Miami-Dade County Police Officer **intentionally shot Baker in the head** and chest while Baker was **unarmed** and posed no serious threat or danger to the Miami-Dade County Police Officer, to any other police officer, or to any other person. Baker became involved in the physical altercation with three Miami-Dade County Police Officers who were investigating a nearby burglary. On "October 24, 2004, after spending time with his family and friends at the above-described location, Baker decided to go home and began walking down the street, when a Miami-Dade County Police Officer drove up and called him over to his patrol car. Baker said 'I ain't done nothing. I'm going home.' However, the Miami-Dade County Police Officer called him over again and Baker repeated that he had done nothing wrong and was going home. As he spoke, he put his hands up in the air showing the Miami-Dade County Police Officer that he was **unarmed**. Notwithstanding the foregoing, the Miami-Dade County Police Officer called for back-up, got out of his patrol car and began to beat Baker with his baton in an effort to arrest him. Soon after, two additional Miami-Dade County patrol officers arrived and began to beat Baker with their batons as well. A physical altercation occurred between Randy Carlos Baker and the three Miami-Dade County Police Officers, **shot and killed Baker**. Throughout the shooting incident Baker was **unarmed** and had no weapons of any kind nor did he pose a threat of harm to any police officer or to any other persons in the proximate vicinity. Moreover, several **by-standers were pleading with the officers to leave Baker alone**, as he had

done nothing wrong and was harmless." *Baker v. Miami-Dade Cnty.*, No. 05-20544-CIV-Lenard/Klein (S.D. Fla. 2003) [D.E. 46, p. 2, 6] (emphasis added);   Ihosvani Rodriguez, *Neighbors Angry at Police After Mentally Ill Man is Slain*, THE SUN SENTINEL, October 26, 2004, http://articles.sun-sentinel.com/2004-10-26/news/0410250496_1_police-officers-miami-dade-police-three-police.

vi.   **Barquin, Leonardo - Date of Incident: January 16, 2004.**

On the afternoon of January 16, 2004, 17-year- old Barquin "left home and he and a friend together jumped the fence of a house." "The police said it was for robbery, but when they caught them, they had nothing, they were without cars or bikes; they were walking; it was one o'clock in the afternoon; and they didn't break any windows to enter the house." "The boy was **unarmed**." A **Miami-Dade County Police Officer shot Barquin in the back** three times and beat him to the point where his casket could not be opened at the funeral because he was so disfigured. Barquin's mother reported, "After he was shot, he was beat in his face and all over his body. They put more than 60 transfusions of blood in the boy and he died alone in the hospital six hours later because no one called me. In spite of knowing his name, the police never called me and he died alone in the hospital." (emphasis added). *Ranck v. Rundle*, No. 08-22235-Civ-Gold/Mcaliley (S.D. Fla. 2008) [D.E. 1]; POLICE CRIMES, June 2, 2006, www.policecrime.proboards.com; FATAL ENCOUNTERS, July 29, 2016, www.fatalencounters.org.

vii.   **Beaugris, Gracia - Date of Incident: October 26, 2007.**

Miami-Dade County **Robbery Intervention Detail (RID)** Police Officer stopped and then **shot Beaugris in the back of the head**. "Beaugris,

19, was coming home from a laundromat with friends when a Miami-Dade County Police **RID** Police Officer stopped and then frisked them. Beaugris, who had emigrated from Haiti six years earlier, tried to question the officer about being stopped. At this point, according to the other youth, the officer shouted profanity at Beaugris, who was already spread-eagled against a wall. The cop shoved him and eventually put him in a chokehold. Beaugris was shot in the arm and fell. Then the Miami Dade cop **fired two more shots into him while on the ground**. **One was in the back of the head** above the ear; another entered his shoulder. The officer's version, reported in the Miami Herald, was that he had believed the victim was going for the officer's gun. Beaugris was **unarmed**. 'He didn't do anything to get shot down,' said one of the teens who was on the scene but asked not to be identified. Beaugris' aunts and father all say that "BG" was a good kid. They say that when he was shot, he was returning from the laundromat after washing his father's work clothes." (emphasis added). Michael Martinez, *Miami police kill unarmed Haitian*, WORKERS WORLD, Nov. 11, 2007, http://www.workers.org/2007/us/miami-1115/; David Ovalle, The Miami Herald, *Three Miami-Dade police shootings justified, prosecutors say*, THE SUN SENTINEL, Aug. 3, 2010, http://articles.sun-sentinel.com/2010-08-03/news/fl-miami-dade-officers-cleared-20100803_1_gracia-beaugris-miami-dade-state-attorney-s-office-deadly-force.

viii.   **Benavides, Fernando - Date of Incident: December 3, 2011.**

After a police chase and Benavides' vehicle was stopped, a Miami-Dade County Police Officer **shot and killed** Benavides because "Benavides made a furtive move inside the truck that put" the cop allegedly in fear for his life. Benavides had been diagnosed with schizophrenia. David Ovalle, *High-profile Miami police shooting still*

*under investigation, five years later*, THE MIAMI HERALD, Apr. 10, 2015, http://www.miamiherald.com/news/local/community/miami-dade/article18215174.html; Brady Report, BRADYCOPS.ORG, Dec. 1, 2014, *available at* http://bradycops.org/states/florida/bradylists/11th2014.pdf.

ix.  **Betancourt, Rosendo - Date of Incident: June 30, 2011.**
Betancourt was a confidential informant of the Miami-Dade County Police, and Miami-Dade County Police Officers **killed Betancourt by shooting him 20 times in his back,** even after he obeyed orders by the officers and was lying face first on the ground with his hands spread wide above his head. The shooting, an execution, was captured on infrared video. Additionally, during this incident, Betancourt was wearing a watch that recorded audio, but the audio of what occurred at the time of the killing disappeared. This fatal shooting by Miami-Dade County Police Officers occurred after the group approached a county-owned home during a marijuana sting operation. The Miami-Dade County Police Department **robbery division** conceived the sting. *Betancourt v. Miami-Dade Cnty.*, No. 1:13-cv-22614-DLG (S.D. Fla. 2013) [D.E. 79]; Tony Piptone & Robbi Peele, *County Agrees to Pay $600k for Deaths in Botched Miami-Dade Police Sting*, NBCMIAMI NEWS, July 28, 2014, http://www.nbcmiami.com/investigations/County-Agrees-to-Pay-600k-for-Deaths-in-Botched-Miami-Dade-Police-Sting-267103161.html. Two years after the killings, one of the Miami-Dade County Police Officers involved was promoted to major and head of the Miami-Dade County Police Department's homicide division. *Benbow v. Miami-Dade Cnty.*, No. 13-cv-20452-GRAHAM (S.D. Fla. 2013) [D.E. 50, p. 1-9]; *Miami-Dade Police Needs to Change Sting Policies, Panel Says*, NBCMIAMI NEWS, Apr. 15, 2015, http://www.nbcmiami.com/news/local/Miami-

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 25

Dade-Police-Needs-to-Change-Sting-Policies-Panel-Says-298980091.html.

x.    **Bueno, Manuel - Date of Incident - May 13, 2011.**

Miami-Dade County Police Officer approached and fatally shot Bueno, a 34-year-old homeless person. Bueno was known in the community to be generally nice and not a threat to anyone. The Miami-Dade County Police Officer claimed that he shot Bueno because he had a knife on him. However, it is **unclear if Bueno had any weapon on him**. *Friends of Man Killed by Dade Police to Gather in Protest,* CBSMIAMI NEWS, May 15, 2011, http://miami.cbslocal.com/2011/05/15/friends-of-man-killed-by-dade-police-to-gather-in-protest/;   *One Dead in Two Separate Police Involved Shootings,* NBCMIAMI NEWS, May 13, 2011, http://www.nbcmiami.com/news/local/1-Dead-in-Two-Seperate-Police-Involved-Shootings-121797439.html.

xi.   **Buford, Edison - Date of Incident - June 10, 2013.**

Miami-Dade County **Robbery Intervention Detail (RID)** Police Officers, including the Defendant herein, **MIGUEL CARBALLOSA**, followed and then shot 28-year-old Buford. Buford was driving a car that was followed by Defendant, **MIGUEL CARBALLOSA, and another RID officer.** The car was reported to match a general description of a car, "a light colored Nissan Maxima" that a **RID** officer had associated with a robbery earlier in the day. A pursuit followed. (**MIGUEL CARBALLOSA**, under oath stated that he had never told someone "the vehicle matched the description of the vehicle taken in the armed robbery.") Ultimately, Buford exited the car. As Buford was running away, **the RID officers shot Buford in the back three times**. Buford was severely injured. **Twenty-seven casings from the RID officers' weapons** were recovered from the scene of the incident.

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 26

**MIGUEL CARBALLOSA** became an Investigator in the Miami-Dade County Police Department. *See* State Attorneys' Final Report and Miami-Dade Police Department Incident Report Number: PD130610214316; Deposition of Miguel Carballosa in *State of Florida v. Edison Buford*, No. F13-14102 (Fla. 11th Cir. Ct. 2013), taken on May 21, 2014.

xii.   **Burnett, Derrel - Date of Incident: April 29, 2004.**

Burnett was sitting on his porch minding his own business when two Miami-Dade County Police Officers approached him, pulled him into the street, and asked him for identification. When the identification was produced, one of the officers realized Burnett was not the person they were looking for, but despite that, the other officer threw Burnett in the police officer's vehicle and began to strike Burnett several times with his fists, a radio, and/or an asp. The Miami-Dade County Police Officer then began to choke Burnett, even though he and a civilian witness were pleading to the Miami-Dade County Police Officer to stop because Burnett had asthma. The officer then leg-shackled and handcuffed Burnett. After Burnett was shackled, the Miami-Dade County Police Officers continued to beat him with their fists, radios, and/or asps until Burnett was bloody and he fell unconscious. Burnett was never given appropriate medical attention and suffered permanent eye damage. *Burnett v. Miami-Dade Cnty.*, No. 07-202-07-CIV-SEITZ/MCALILEY (Fla. 11th Cir. Ct. 2007) [D.E. 1].

xiii.   **Copeland, Brian Andrew - Date of Incident: February 9, 2009.**

Miami-Dade County Police Officer stopped 21-year-old Copeland for a routine traffic stop. Copeland was afraid of the Miami-Dade County Police Officer, so as the officer walked toward the car, Copeland accelerated the vehicle and accidentally smashed into the patrol car. In

Case 1:14-cv-23285-FAM   Document 89   Entered on FLSD Docket 10/03/2016   Page 27 of 74

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 27

response, the Miami-Dade County Police Officer shot Copeland in the arm. *Copeland v. Sheriff of Metro. Dade Cnty.*, No. 09-23678-CV-KING (S.D. Fla. 2009 [D.E. 1]; Jennifer Lebovich & David Ovalle, *Police Shoot Pines Driver, Say he Tried to hit Officer,* THE SUN SENTINEL, Feb. 10, 2009, http://articles.sun-sentinel.com/2009-02-10/news/0902090598_1_miami-dade-police-officer-man-shot; Doug Phillips, *Miami Police: Suspect Shot After Driving Toward Them,* ORLANDO SENTINEL, Feb. 10, 2009, http://articles.orlandosentinel.com/2009-02-10/news/stop10_1_copeland-traffic-stop-miami-police.

xiv.   **Cure, Latasha - Date of Incident: November 12, 2007.**

23-year-old Cure was a passenger in a vehicle with her boyfriend, Michael Knight, and another friend, Frisco Blackwood.  All were in their early 20's and had celebrated a 21st birthday when Miami-Dade County **Robbery Intervention Detail (RID) Police Officers** shot and killed the two young men and caused serious bodily injury to Cure. The officers began pursuing the vehicle for the purported traffic violation of failing to fully stop for a red light, claiming that the driver ignored the traffic control device. The alleged police pursuit, without any police lights on, ended at a dead-end street where a "fusillade of 27 police-fired bullets killed" two of the young people and wounded Cure. **None of the vehicle's occupants were armed, and they were no threat to the RID officers.** Cure and her boyfriend **begged the RID officers to stop shooting and pled for their lives**, but the officers did not stop shooting. Cure climbed into the back seat crouched for safety and witnessed the death of both young men. *Knight v. Miami-Dade Cnty.*, No. 09-23462-Civ-Grahm/Torres (S.D. Fla. 2009) [D.E. 1]; Charles Rabin, *Court strips immunity from Miami-Dade officer who shot and killed two men; trial under way*, THE MIAMI HERALD, Sept. 26, 2016,

http://www.miamihearld.com/news/local/community/miami-dade/article1966267.html.

xv. **Dukes, Theodore - Date of Incident: October 11, 2001.**

Three unmarked and plainclothes **Robbery Intervention Detail (RID)** Miami-Dade County Police Officers boxed in 39-year-old Theodore Dukes' Honda Civic car with Dukes and two other occupants inside after they had left a local store and made a purchase. They were not involved in any criminal activity. The occupants of the car feared for their lives and that they were being carjacked, so the driver sped away. The **RID officers** shot two of the occupants of the vehicle. Dukes tried to make his way to Jackson Memorial Hospital and then saw blue lights following them. Dukes stopped the car and exited with his **hands up**. Miami-Dade County **RID Police Officers slammed Dukes to the ground**, **kicked and beat him** even though he had already been shot, was injured, and bleeding. Dukes was in the hospital for 17 days, three of which he spent in a coma. *Dukes v. Miami-Dade Cnty.*, No. 1:05-cv-22665-PCH (S.D. Fla. 2005) [D.E. 1].

xvi. **Gregory, Sebastian - Date of Incident: May 28, 2012.**

16-year-old Gregory was **walking down the street** when for no apparent reason, a Miami-Dade County Police Officer approached him from behind, told Gregory to get on the ground, and as Gregory was getting prone on the ground the officer **shot him in the back multiple times**. The bullets injured Gregory's spine and many vital organs including Gregory's liver, colon, stomach, spleen, left diaphragm, and right kidney. Gregory had no movement in his lower extremities. "At the time Gregory was **repeatedly shot in the back** by the Miami-Dade County Police Officer, Gregory was not committing a crime and had not threatened the officer. Gregory did not engage in any conduct at

the time he was shot that justified the officer's use of any amount of force upon him – let alone the use of deadly force."  Gregory was never arrested for, nor charged, with any crime relating to the incident. *Gregory v. Miami-Dade Cnty.*, No. 13-21350-CIV-GRAHAM (S.D. Fla. 2013) [D.E. 60, p. 1-4) (emphasis added).

xvii.  **Harrigan, Leon Fitzgerald - Date of Incident: July 13, 2012.**

Miami-Dade County Police shot 48-year-old Leon Harrigan. Because of the shooting, Harrigan now suffers from severe muscle and tissue damage. Harrigan is a *pro se* plaintiff in a case against Miami-Dade County, and in an appeal, the Eleventh Circuit states: "Construing the pleadings liberally and the facts in the light most favorable to Plaintiff, we must assume that Defendant **fired at the truck Plaintiff was driving while it was stopped at an intersection**, **surrounded by three patrol cars, and unprovoked by any action on the part of Plaintiff**. We must further assume that, **although Defendant had reason to suspect Plaintiff was driving a stolen vehicle, he had no other indication that Plaintiff was dangerous or posed an imminent threat of harm. If these assumptions prove to be true, Defendant's conduct was unreasonable, and thus unconstitutional**. *See Morton v. Kirkwood,* 707 F.3d 1276, 1282 (11th Cir.2013) (stating that it would violate the Fourth Amendment for an officer to shoot 'an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger'); *cf. Terrell v. Smith,* 668 F.3d 1244, 1255 (11th Cir.2012) (granting qualified immunity where 'an objectively reasonable law enforcement officer could well have perceived that [a] moving vehicle was being used as a deadly weapon')." *Harrigan v. Metro-Dade Police Dep't Station #4*, 636 Fed. Appx. 470, 474-75 (11th Cir. 2015)

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 30

(emphasis added); *Harrigan v. Metro-Dade Police Station #4,* No. 1:12-cv-22993-Martinez/White (S.D. Fla. 2012) [D.E. 20].

xviii.   **Heaven, Donald - Date of Incident: 1991.**

Heaven, a North Dade Optimist Children's soccer team coach, while at a game at Miami Lakes Junior High School, was beaten by a Miami-Dade County Police Officer. One of the officers threw alcohol in Heaven's face and put a gun to his temple while screaming racial slurs at him. Heaven had done nothing wrong when the officers showed up to the soccer game after a fight had broken out. Heaven sustained a broken finger, a bruised wrist, several abrasions, and was booked with 22 separate fraudulent felony charges, all of which were dropped. Heaven reportedly spent $110,000.00 to clear his name. *Heaven v. Metro. Dade Cnty.*, No. 93-07448-CA-11 (Fla. 11th Cir. Ct. 1993); Tessie Borden, *Coach Wins Misconduct Case Against Dade Cop*, THE SUN SENTINEL, Mar. 20, 1997, http://articles.sun-sentinel.com/1997-03-20/news/9703200044_1_heaven-s-face-affairs-report-officers; Amy Driscoll, *Man Wins $2 Million For Police Misconduct*, THE MIAMI HERALD, Mar. 20, 1997, at 1B.

xix.   **Hernandez, Reynaldo - Date of Incident: November 22, 2011.**

Three Miami-Dade County **Robbery Intervention Detail (RID)** Police Officers, including Defendant **MIGUEL CARBALLOSA**, went to 52-year-old Reynaldo Hernandez's home to arrest Hernandez for the homicide of his common law wife, Misley Gonzalez. While placing Hernandez under arrest, three Miami-Dade County **RID officers**, including Defendant, Miguel Carballosa, shot Hernandez numerous times and killed him. **Thirty-eight (38) casings from the RID officers' weapons** were recovered from the scene of the incident. Brian Hamacher & Julia Bagg, *Hialeah Man Who Shot Wife Killed By Police*,

Case 1:14-cv-23285-FAM   Document 89   Entered on FLSD Docket 10/03/2016   Page 31 of 74

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 31

NBCMIAMI NEWS, Nov. 23, 2011, http://www.nbcmiami.com/news/Man-Killed-in-Police-Involved-Shooting-in-Hialeah-134383688.html; Miami-Dade County Police Report, C/N PD111122467839.

xx.   **Holloway, James - Date of Incident: October 2, 2008.**

Miami-Dade County **Robbery Intervention Detail (RID)** Police Officers with bright lights were following Holloway dangerously close **without any police lights on**. This incident occurred near 2471 Northwest 59th Street. Holloway pulled over and got out of the car. When Holloway got out of the car, two Miami-Dade County Police Officers **dressed in all black** got out of their vehicle with guns drawn and pointed at Holloway. **"The police that wears all black are highly known in my area for beating black males half to death."** Afraid for his life, Holloway ran away from the RID officers dressed in all black. The officers soon caught up to him and put Holloway in a tight chokehold and hit his head on the ground. After Holloway was on the ground, the officers kicked and broke some of Holloway's ribs. Holloway passed out from the pain and only came to when the officers slapped him in the face and dragged his body while he was handcuffed. The officers proceeded to take all the money in Holloway's wallet. The beatings did not stop until the officers realized that Holloway knew a member of the NAACP and the officers commented, "GOD forbid if there's a camera on one of these poles then we're f***ed, I'm telling you man we're f****ed". **The offense incident report for the killing of David Alexis lists as being present several of the same officers involved in this incident.** One of the officers involved in this incident is a **RID Officer shooter** in the incident where Natasha Cure was shot and Frisco Blackwood and Michael Knight were killed, and referenced herein. *Holloway v. Diaz*, No. 1:11-cv-23069-CMA (S.D. Fla. 2011) [D.E. 1] (emphasis added).

xxi.  **Hoyos, Oscar - Date of Incident: March 4, 1994.**

Hoyos was choked, pushed to the ground, kicked, and hit about his upper body with a flashlight by Miami-Dade County Police Officers. *Hoyos v. Metro. Dade Cnty*, No. 97-cv-3107-MORENO (S.D. Fla. 1997) [D.E. 1].

xxii.  **Jean-Baptiste, Erlis - Date of Incident: July 23, 2003.**

Jean-Baptiste was **shot** by a Miami-Dade County Police Officer after a car chase near 625 Northeast 137th Street. Jean-Baptiste **fell to the ground after being shot** by the officer. While Jean-Baptiste was on the ground, "with sadistic intent" the **officer stood above the defenseless Jean-Baptiste and shot him 12 to 13 more times in the lower body and testicles.** Jean-Baptiste is permanently confined to a wheelchair. *Jean-Baptiste v. Gutierrez*, No. 07-cv-21728-CIV-GOLD/WHITE (S.D. Fla. 2007) [D.E. 1].

xxiii.  **Johnson, Xavier - Date of Incident: January 4, 2013.**

Johnson was shot and killed by Miami-Dade County Police Officers when they fired multiple rounds into a vehicle after a high-speed chase following a report of a shoplifting of makeup from a CVS store. Once the vehicle in which Johnson was riding crashed, **the officers began firing at the car and shot the helpless, injured occupants in the vehicle**, including Johnson. Johnson died a few hours later at Kendall Regional Medical Center. *Whitaker v. Miami-Dade Cnty.*, No. 1:13-cv-24450-LENARD/O'SULLIVAN (S.D. Fla. 2013) [D.E. 23].

xxiv.  **Knezevich, Michael - Date of Incident: April 4, 1994.**

Knezevich was a manager with the United States Customs Service. An ex-girlfriend brought two Miami-Dade Police Officers to Knezevich's apartment under the pretense to recover her clothing. The Miami-Dade

Case 1:14-cv-23285-FAM   Document 89   Entered on FLSD Docket 10/03/2016   Page 33 of 74

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 33

County Police Officers forced the front door open so that they and the ex-girlfriend could enter. The officers then punched Knezevich, put him in a headlock, and then beat him around the head, neck, shoulders, and back with a police-issued metal flashlight. Miami-Dade County Police Officers then **filed false police reports** and gave perjured testimony to commence a malicious prosecution against Knezevich. *Knezevich v. Metro. Dade Cnty.*, No. 95-2487-CIV-DAVIS (S.D. Fla. 1995) [D.E. 40].

xxv.   **Knight, Michael - Date of Incident: November 12, 2007.**

21-year-old Knight was driving his Cadillac with his girlfriend, Latasha Cure, and another friend, Frisco Blackwood. All were in their early 20's and had celebrated a 21st birthday when Miami-Dade County **Robbery Intervention Detail (RID)** Police Officers shot and killed the two young men and caused serious bodily injury to Cure. The officers began pursuing the vehicle for the purported traffic violation of failing to fully stop for a red light, claiming that the driver ignored the traffic control device. The alleged police pursuit, without any police lights on, ended at a dead-end street where a "fusillade of 27 police-fired bullets killed" two young people and wounded Cure. **None of the vehicle's occupants were armed, and they were no threat to the RID officers.** Knight and Cure begged the RID officers to stop shooting and pled for their lives, but the officers did not stop shooting. Cure climbed into the back seat crouched for safety and witnessed the death of both young men. Frisco Blackwood was the second young man killed in this incident and is not listed separately herein. *Knight v. Miami-Dade Cnty.*, No. 09-23462-Civ-Grahm/Torres (S.D. Fla. 2009) [D.E. 1]; Charles Rabin, *Court strips immunity from Miami-Dade officer who shot and killed two men; trial under way*, THE MIAMI HERALD, Sept. 26,

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 34

2016, http://www.miamihearld.com/news/local/community/miami-dade/article1966267.html.

xxvi.   **Lemus, Jorge Luis - Date of Incident: June 30, 2011.**

This fatal shooting by Miami-Dade County Police Officers occurred after the group approached a county-owned home to conduct a marijuana sting operation. The officers ordered the men to the ground. However, the officers **gave orders without any being dressed in police uniforms**, **without displaying any badges, and there were no marked police cars on the scene.** Lemus believed the officers to be drug dealers, so he fled.  As Lemus was running for safety, the **officers shot him in the back** and killed him. The Miami-Dade County Police Department **robbery division** conceived the sting, and it was carried out by other Miami-Dade Police divisions. *Santana v. Miami-Dade Cnty.*, No. 1:13-cv-22289-UU (S.D. Fla. 2013) [D.E. 6]; Tony Piptone & Robbi Peele, *County Agrees to Pay $600k for Deaths in Botched Miami-Dade Police Sting*, NBCMIAMI NEWS, July 28, 2014, http://www.nbcmiami.com/investigations/County-Agrees-to-Pay-600k-for-Deaths-in-Botched-Miami-Dade-Police-Sting-267103161.html.

xxvii.  **Lumpkin, Joseph - Date of Incident: April 27, 2008.**

31-year-old Lumpkin was fatally shot by a Miami-Dade County Police Officer when he was suspected of being a shoplifter at the Southland Mall in Goulds. The officer reported they grappled for the gun, which then discharged. The bullet pierced Lumpkin's chest and was fatal. He died at the scene. *Florida in Brief*, THE ST. AUGUSTINE RECORD, Apr. 29, 2008, http://staugustine.com/stories/042908/state_txt01_013.shtml#.V-whGKIrJZg.

xxviii.   **Macklin, Eddie - Date of Incident: January 21, 2002.**

During a Martin Luther King Day parade, 20-year-old Macklin was fatally shot by a Miami-Dade County **Robbery Intervention Detail (RID)** Police Officer. Macklin was shot after **RID plainclothes officers** swarmed what was purportedly thought to be a stolen vehicle that Macklin was driving. One officer jumped onto the hood of the vehicle and fired through the windshield, killing Macklin inside. At the time, this fatal shooting was at least the third fatal shooting of a black man by a local police officer within the prior year. Adrian Sainz, *Demonstrators protest MLK Day shooting of black car thief*, THE LEDGER, Jan. 23, 2002, http://www.theledger.com/news/20020123/demonstrators-protest-mlk-day-shooting-of-black-car-thief; David CM-Azares, *Fatal Police Shooting Sparks Protest Rally in Miami*, THE SUN SENTINEL, Jan. 23, 2002, http://articles.sun-sentinel.com/2002-01-23/news/0201230104_1_miami-dade-police-officers-liberty-city; Diana Marrero, *Police Won't Be Charged In Death*, THE SUN SENTINEL, January 23, 2003, http://articles.sun-sentinel.com/2003-01-23/news/0301230129_1_shooting-death-criminal-charges-miami-dade-police.

xxix.   **Madison, George - Date of Incident: October 8, 2009.**

The same Miami-Dade County Robbery **Intervention Detail (RID)** Police Officer who shot and killed Eddie Macklin, **and two other RID officers,** assaulted and battered George Madison and his sister, Sarah Myles. **One of the RID officers involved in the Madison and Myles incidents was at the scene of the killing of David Alexis and was a superior of Defendant, MIGUEL CARBALLOSA at the time of the killing of David Alexis**. Madison and Myles had just arrived in their separate cars to the family's apartment complex after spending an afternoon with family at Hadley Park. **Without any basis for a stop, a**

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 36

**RID officer in a black T-shirt** pulled up and was rude and disrespectful to Myles. He shouted questions including, "Whose f***ing white Toyota is this?" The RID officer aggressively asked for Myles' identification and other information while Myles was helping her small children get out of her car. Myles complied with the RID officer's request and then called 911 to report the RID officer's behavior. While the RID officer was then aggressively talking to Madison, he heard Myles on the telephone with 911. The RID officer grabbed Madison by the neck, knocked Madison to the ground, and choked him. **Two other RID officers arrived and joined in the assault on Madison**. *Myles v. Miami-Dade Cnty.*, No. 12-cv-23314-KMM (S.D. Fla. 2012) [D.E. 23]; Michael E. Miller, *Sarah Myles Says Miami-Dade Cops Broke Her Wrist, Invented Charges Against Her*, MIAMI NEW TIMES, June 30, 2011, http://www.miaminewtimes.com/news/sarah-myles-says-miami-dade-cops-broke-her-wrist-invented-charges-against-her-6539471.

xxx.  **Martinez, Elsa - Date of Incident: October 3, 2010.**

Gustavo Martinez was talking to his sister, Elsa Martinez, when a Miami-Dade County Police Officer, working a security detail, began to direct profanities and insults toward Gustavo regarding his discussion with his sister, Elsa. When Gustavo backed away from the Miami-Dade County Police Officer in order to peacefully discuss the situation, another Miami-Dade County Police Officer body slammed Gustavo and knocked him to the ground. The officers then proceeded to ground Gustavo's face into the ground and strike him in the head. Then, without cause or provocation, the officers turned their aggression to Elsa and grabbed her by her neck/throat and slammed her body onto a nearby bench**.** *Martinez v. Miami-Dade Cnty.*, No. 12-23534-Civ-SEITZ/SIMONTON (S.D. Fla. 2012) [D.E. 1].

xxxi.   **Martinez, Gustavo - Date of Incident: October 3, 2010.**

Gustavo Martinez was talking to his sister when a Miami-Dade County Police Officer, working a security detail, began to direct profanities toward Martinez regarding his discussion with his sister, Elsa. When Martinez backed away from Miami-Dade County Police Officer in order to peacefully discuss the situation, another Miami-Dade County Police Officer body slammed Martinez and knocked him to the ground. The officers then proceeded to slam Martinez's face into the ground and strike him in the head several times. *Martinez v. Miami-Dade Cnty.*, No. 12-23534-Civ-SEITZ/SIMONTON (S.D. Fla. 2012) [D.E. 1].

xxxii.  **McClellion, Jerome - Date of Incident: September 13, 2000.**

There was an improper police chase by Miami-Dade County **Robbery Intervention Detail (RID)** Police Officers. McClellion surrendered and was subdued. Then, **while on the ground, McClellion was beaten, kicked in the head, and punched by the RID officers**. The beating was caught on **camera**. Rafael A. Olmeda, *Ruling Upsets Black Leaders*, THE SUN SENTINEL, June 30, 2001, http://articles.sun-sentinel.com/2001-06-30/news/0106300075_1_hanlon-miami-dade-controversial-arrest; Bob Norman, *Hollywood's Mickey Mouse Cops, Parts I and II*, MIAMI NEW TIMES, Aug. 6, 2009, http://www.miaminewtimes.com/news/hollywoods-mickey-mouse-cops-parts-i-and-ii-6365590; Mike Italie, *Cops beating of youth in Miami sparks protest*, THE MILITANT, Oct. 2, 2000, http://www.themilitant.com/2000/6437/643759.shtml.

xxxiii. **Miller, Durall - Date of Incident: April 15, 2011.**

Miami-Dade County Police Officers came to 24-year-old Miller's home on the suspicion that he shot at Miami-Dade County Police Officers a couple of days before. When Miller heard that the Miami-Dade County

Police Officers were at his door, Miller ran into the attic scared for his life. Miami-Dade County Police Officers demanded Miller leave his residence, and Miller refused to do so. In response, **the Miami-Dade County Officers shot and killed an unarmed** Miller. *Man Wanted for Shooting Cop Killed in Miami Gardens,* CBSMIAMI NEWS, Apr. 19, 2011, http://miami.cbslocal.com/2011/04/19/man-wanted-for-shooting-cop-killed-in-miami-gardens/.

xxxiv.    **Morris, Rudolph - Date of Incident: June 12, 2005.**

On or about March 2, 2011, Miami-Dade County Circuit Court Judge William Thomas held: **"[Miami Dade County Officer] did not see Morris with a gun, taser, or weapon of any kind. . . . At the time of the shooting, the officer could not reasonably have believed that the suspect posed any immediate threat to the officers or a threat to others. Mr. Morris was simply trying to escape and he was shot for no other reason than to prevent an escape. . . . [Miami-Dade County Officer] should have known the clearly established law in the State of Florida prohibited the shooting of an unarmed suspect in the back while the person is running away . . . [such conduct is] a violation of the Fourth Amendment."** *Williams v. Miami-Dade Cnty.*, No. 07-16063 CA 21 (Fla. 11th Cir. Ct. 2007) [Filing # 20110197714] (emphasis added). Morris posed no threat of violence to the officers involved or to the public at the time of he was shot and killed. The facts are described as follows: "On June 12, 2005, at approximately 7:50 p.m., Morris entered 'The Eighteenth Avenue Market,' an open convenience store located at 6600 N.W. 18th Avenue, in Miami. Mr. Morris was **unarmed.** Officers of the Miami Dade Police Department entered the store to investigate Mr. Morris's connection to a stolen car. Upon seeing Mr. Morris, the officers ordered him to the ground. Officer stood over and straddled Mr. Morris

to handcuff him.  Mr. Morris then raised his back. Officer responded by simply pushing Mr. Morris down with his foot. Inexplicably, while her partner was standing directly over Morris, Officer reacted by drawing her Taser and firing at Mr. Morris.  She missed Morris, and struck her partner, Officer, in the leg.  Mr. Morris ran past Officer. Morris was still **unarmed**. From behind, Officer drew her service revolver and shot Morris twice, once in back and once in the back of the elbow. Mr. Morris fell near the front door to the store. Mr. Morris exclaimed just before he died, 'You didn't have to shoot me.'" *See* Plaintiff's Response and Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss Plaintiff's Amended Complaint, *Williams v. Miami-Dade Cnty.*, No. 07-16063 CA 21 (Fla. 11th Cir. Ct. 2007) (emphasis added); Michael Puttney, *Judge: Fla. Officer Unjustified in Shooting*, OFFICER.COM, Mar. 2, 2011, www.officer.com/news/10246794/judge-fla-officer-unjustified-in-shooting; *Court Rules Miami Dade Police Responsible in Shooting Death of Young African American Man*, PR NEWSWIRE, Mar. 1, 2011, http://www.prnewswire.com/news-releases/court-rules-miami-dade-police-responsible-in-shooting-death-of-young-african-american-man-117141923.html.

xxxv.   **Mitchell, Donald Roy - Date of Incident: July 17, 1998.**

Mitchell, a black man, was returning home between 8:00 p.m. and 8:30 p.m. The facts are described in the Second Amended Complaint as follows: After a brief stop at the home of his neighbor, Mitchell drove to his own residence, which was located across the street. A Miami-Dade County Police Officer was on a routine patrol in his patrol car on the street where Mitchell lived. While Mitchell pulled into his driveway, the officer, for no reason other than unsubstantiated and biased suspicion, made a U-turn and, with his patrol car's lights flashing, raced into Mitchell's driveway and parked his car in a position directly behind

Mitchell's car. The officer approached the driver's side of Mitchell's vehicle and began interrogating Mitchell without providing any reason for the stop or interrogation. Mitchell continuously asked the officer, "What did I do?" The officer refused to answer the question, and Mitchell was never charged with any offense justifying the unwarranted examination. Insulted by Mitchell's inquiry into the reason for his sudden arrest, and without a warrant or any probable cause, the officer ordered Mitchell to get out of the car, still without levying a charge. Mitchell again asked for the reasons for the stop. The officer answered by shouting, "Get out of the vehicle," followed by an expletive. Mitchell refused to get out of the vehicle until he was properly informed of the reasons for the arrest. At no time was the officer or any other officer ever reasonably in fear for their respective safety. Instead, the officer was merely offended that a black man questioned his authority. The officer requested backup officers to assist him, and within minutes, five police cars were on scene. Ultimately, 17 police vehicles came to the scene, including 16 Miami-Dade marked cars and one private unmarked car. When Mitchell again refused to leave the confines of his vehicle until being informed of the reasons for his arrest, two of the officers without any justifiable provocation whatsoever, and in a wanton reckless, willful, and malicious manner, physically assaulted Mitchell by punching and kicking him, hitting him with objects supplied by the police department while Mitchell was being handcuffed and otherwise holding Mitchell in a defenseless posture. Throughout the ordeal, Mitchell continued to ask, "What did I do?" and was never provided an answer. *Mitchell v. Miami-Dade Cnty.*, No. 00-1016-CIV-GRAHAM (S.D. Fla. 2000) [D.E. 58].

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 41

xxxvi.   **Myles, Sarah - Date of Incident: October 8, 2009.**

The same Miami-Dade County **Robbery Intervention Detail (RID)** Police Officer who shot and killed Eddie Macklin, **and two other RID officers,** assaulted and battered George Madison and his sister, Sarah Myles. **One of the RID officers involved in Madison and Myles incident was at the scene of the killing of David Alexis and was a superior of Defendant, MIGUEL CARBALLOSA at the time of the killing of David Alexis**. Madison and Myles had just arrived in their separate cars to the family's apartment complex after spending an afternoon with family at Hadley Park. **Without any basis for a stop, a RID officer in a black T-shirt** pulled up and was rude and disrespectful to Myles. He shouted questions including, "Whose f***ing white Toyota is this?" The RID officer aggressively asked for Myles' identification and other information while Myles was helping her small children get out of her car. Myles complied with the RID officer's request and then called 911 to report the RID officer's behavior. While the RID officer was then aggressively talking to Madison, he heard Myles on the telephone with 911. The RID officer grabbed Madison by the neck, knocked Madison to the ground, and choked him. **Two other RID officers arrived and joined in the assault on Myles and broke her wrist**. *Myles v. Miami-Dade Cnty.*, No. 12-cv-23314-KMM (S.D. Fla. 2012) [D.E. 23]; Michael E. Miller, *Sarah Myles Says Miami-Dade Cops Broke Her Wrist, Invented Charges Against Her*, MIAMI NEW TIMES, June 30, 2011, http://www.miaminewtimes.com/news/sarah-myles-says-miami-dade-cops-broke-her-wrist-invented-charges-against-her-6539471.

xxxvii.   **Perez, Michael - Date of Incident: March 24, 1995.**

Perez and his partner, both detectives in the Miami-Dade County Police Department, were working undercover when they overheard a

police radio report that fellow officers were in pursuit of several black males who had just robbed a Radio Shack. Perez and his partner joined the chase, and, upon discovering the suspects driving away from the scene, followed them by car. When the suspects abandoned their vehicle, Perez and his partner chased them on foot. Meanwhile, another Miami-Dade County Police Officer was patrolling in his police car when he heard the same radio report. **The other Miami-Dade County Police Officer saw Perez and his partner running along the street in the same area and thought they were the suspects and ran over Perez intentionally with his vehicle. Perez suffered serious injuries, including a compound fracture of his leg, knee injuries, and back injuries**. *Perez v. Miami-Dade Cnty.*, No. 97-1915-CIV-KING (S.D. Fla. 1997) [D.E. 1]; Affidavit of Kenneth Harms, *Perez v. Miami-Dade Cnty.*, No. 97-1915-CIV (S.D. Fla. 2004), *available at* 2004 WL 3607625.

xxxviii.　**Perez, Rene - Date of Incident**: **October 1, 2002.**

A Miami-Dade County Police Officer used his police issued vehicle to strike Perez in an effort to apprehend him and denied doing so. Multiple witnesses stated the officer was repeatedly put on notice that Perez needed immediate medical attention but failed to obtain necessary medical treatment. Perez suffered a broken back. *Perez v. Miami-Dade Cnty.*, No. 06-020109-CA-01 (Fla. 11th Cir. Ct. 2006).

xxxix.　**Prieto, Florentino** - **Date of Incident: August 17, 1997.**

Prieto was stopped by Miami-Dade County Police Officers and was arrested on a simple traffic charge. Miami-Dade County Police Officers took Prieto to Miami-Dade's Hammocks Police Station for processing and ordered Prieto to take off his belt. As Prieto was doing what the officers asked him to do, the officers struck him, pushed him against a

wall, pushed him against a stool, and with a closed fist struck him about the face and eye. *Prieto v. Miami-Dade Cnty.*, No. 99-2299-CIV-MOORE (S.D. Fla. 1999) [D.E. 24].

xl.  **Quesada, Luis - Date of Incident: November 2, 2007.**

16-year-old Quesada was choked until he was unconscious by a Miami-Dade County Police Officer at a private party. Two Miami-Dade County Police Officers had responded to another call and upon a premise of loud music went to a private home nearby at around 11:00 p.m. to break up the party. The Miami-Dade County Police **Officers filed fraudulent charges** against Quesada. There was no probable cause to restrain, arrest, or charge Quesada with any criminal offense. *Quesada v. Miami-Dade Cnty.*, No. 11-25936 CA 08 (Fla. 11th Cir. Ct. 2011) [Filing # 43972685].

xli.  **Ramos, John - Date of Incident: June 29, 2010.**

Ramos and his fiancé were at the family home with their infant minding their own business when six Miami-Dade County Police Officers appeared at their home. They required Ramos' fiancé with the infant child to leave apartment. Then, the Miami-Dade County Officers entered Ramos' apartment and kept him in the apartment against his will. The Miami-Dade County Police Officers then beat Ramos about his body. The officers "with great force, punched, kicked, beat and struck Plaintiff countless times including on his head, face, torso, and extremities for approximately 5-10 minutes," and "[w]ith excessive force, beat Ramos to the ground, and then placed handcuffs on Ramos so tight to cause Ramos extreme pain and discomfort." During the beating, one of the Miami-Dade County Police Officers went outside and prevented Ramos' fiancé from calling fire-rescue or other police to help Ramos, after she saw the beginning of the beating and heard

Ramos' cries for help. The officers then removed Ramos' blood-soaked clothes destroying evidence. **"Bogus criminal charges"** were filed by the officers against Ramos and were dismissed. *Ramos v. Miami-Dade Cnty.*, No. 12-21888-CIV-ALTONAGA (S.D. FLA. 2012) [D.E. 33] (emphasis added).

xlii.   **Robertson, Michael - Date of Incidence: April 23, 2010.**

While 56-year-old Michael and 58-year-old Vanessa were closing their café, **five Miami-Dade County Robbery Intervention Unit (RID)** Police Officers entered and started verbally assaulting Michael and Vanessa while referencing an investigation that was not related to them or their café located at 5820 Northwest 17th Avenue in Miami. Michael and Vanessa asked the RID officers to leave after one of the **RID officers** got into Michael's face continuing a **"verbal tirade, spitting saliva and foul language into Michael's face."** Instead of the officers leaving as requested, one of the **RID officers hit Michael in the face with a closed fist, sending him to the ground**. **Another of the RID officers then jumped on Michael's body and continued to beat him, causing severe injuries**. Michael was then brought to jail and **falsely charged with crimes**. The RID officers grabbed Vanessa by the throat and threw her into a restaurant booth. *Robertson v. Miami-Dade Cnty.*, No. 15-CV-24371-UNGARO (S.D. Fla. 2015) [D.E. 19] (emphasis added).

xliii.   **Robertson, Vanessa - Date of Incident: April 23, 2010.**

While 56-year-old Michael and 58-year-old Vanessa were closing their café, five **Miami-Dade County Robbery Intervention Unit (RID) Police Officers** entered and started verbally assaulting Michael and Vanessa while referencing an investigation that was not related to them or their café.  Michael and Vanessa asked the RID officers to

leave after one of the officers got into Michael's face continuing a
"verbal tirade, spitting saliva and foul language into Michael's face."
Instead of the RID officers leaving as requested, one of the RID
officers hit Michael in the face with a closed fist, sending him to the
ground. Another of the RID officers then jumped on Michael's body and
continued to beat him, causing severe injuries. Michael was then
brought to jail and falsely charged with crimes. **The RID officers
grabbed Vanessa by the throat and threw her into a restaurant
booth**. Vanessa was arrested and **RID officers filed false criminal
charges**. *Robertson v. Miami-Dade Cnty.*, No. 15-CV-24371-UNGARO
(S.D. Fla. 2015) [D.E. 19].

xliv.   **Rodriguez, Dilfredy - Date of Incident: June 20, 2006.**

Miami-Dade County Police Officer pulled over Rodriguez on the
suspicion that he was driving under the influence after Rodriguez
bumped into the officer's car multiple times. **The Miami-Dade County
Police Officer shot and killed Rodriguez**. *Digest,* THE SUN SENTINEL,
June   22   2006,   http://articles.sun-sentinel.com/2006-06-
22/news/0606211417_1_police-officer-shot-van-s-path-officer-s-
vehicle; David Ovalle, *Freedom, Then Tragic End to 3 Lives*, THE MIAMI
HERALD, Oct. 11, 2006, at 1A.

xlv.   **Rodriguez, Jose - Date of Incident: February 14, 2008.**

Rodriguez, a former United States Marine, received notice that the
burglar alarm went off at the store he owned and managed. Rodriguez
went to the store in his vehicle with his lawfully owned firearm to
determine what triggered the burglar alarm. Once he arrived at his
store, he got out his car and was **shot in the back**. He was **shot four
times from behind, in the back,** left buttock, left leg, and left elbow.
**Rodriguez was shot without ever seeing the Miami Dade County**

**Police Officer and without the officer ever having identified himself or warning Rodriguez**. As Rodriguez lay in a pool of his own blood and was in need of urgent medical assistance, the officer walked by as Rodriguez pleaded for assistance. The officer said words to the effect of, "you think I'm going to help you now" and **did not provide medical assistance or call for medical assistance**. Rodriguez had to have surgery to remove approximately five feet of his intestines, suffered a fracture in his left arm, and has a bullet lodged in his right leg. A portion of the ulnar bone in his arm had to be removed, and he suffered permanent damage to his ulnar nerve. **Rodriguez was not arrested nor even subject to arrest because he had done nothing wrong and was merely an innocent civilian arriving at his business in response to his burglar alarm**. Second Amended Complaint, *Rodriguez v. Miami-Dade Cnty.*, No. 08-58903 CA 21 (Fla. 11th Cir. Ct. 2008).

xlvi.    **Rogers, Marcus - Date of Incident: September 22, 2010.**

Marcus was **shot and killed by a Miami-Dade County Robbery Intervention Detail (RID) Police Officer**. RID officers, some dressed in all black, entered the Rogers' home with guns drawn. Police suspected Rogers of having committed an attempted robbery earlier that day. When Miami-Dade County Police Officers entered, they told everyone to sit down. Rogers attempted to run towards the front door, and a RID officer grabbed Rogers by the shoulder and shot him at close range. Marcus died from his on October 31, 2010. *Rogers v. Miami-Dade Cnty.*, No. 12-34579-CA-22 (Fla. 11th Cir. Ct. 2012) [D.E. 1-1]. **The RID officer who shot and killed Rogers was involved as a shooter with Defendant, MIGUEL CARBALLOSA, in another police shooting and was also listed on the police incident report as present at the scene of the David Alexis killing.**

xlvii.   **Salgado, George - Date of Incident: April 12, 2012.**

Naked and **unarmed**, 21-year-old Salgado died after suffering **19 Taser shots and a beating at the hands of multiple Miami-Dade County Police Officers.** Rodriguez was taken to Larkin Hospital in handcuffs and leg restraints. Proper medical care could not be provided for almost an hour because no officer went to the hospital. Finally, hospital staff called 911 in order to have an officer respond to the hospital to take off the handcuffs. Rodriguez was diagnosed with respiratory failure, acidosis, and a subarachnoid hemorrhage and went into cardiac arrest several times. He was transferred to the Intensive Care Unit where he died the next morning. *Salgado v. Miami-Dade Cnty.*, No. 12-cv-24458-KING/TORRES (S.D. Fla. 2012) [D.E. 75].

xlviii.   **Sanchez, Lazaro - Date of Incident**: **November 2, 2006.**

At 8:30 in the morning, Sanchez was **repairing a broken window at a private residence**. Sanchez had permission from the owner/occupant of the residence to be on the property, and **he was not involved in any illegal activity**. As Sanchez **had his hands on a new pane of glass on the window**, holding it in the frame, he was **approached from behind by two Miami-Dade County Police Officers**. One of the officers grabbed Sanchez and **violently threw him to the ground**, tearing the labrum in Sanchez's shoulder. Sanchez required surgery to repair his shoulder. Complaint, *Sanchez v. Miami-Dade Cnty.*, No. 09-39232-CA-31 (Fla. 11th Cir. Ct. 2009).

xlix.   **Santana, Michael - Date of Incident: March 7, 2012.**

Soon after Santana and his girlfriend sat down to eat dinner, Santana was shot and killed by a Miami-Dade County Special Response Team (SRT) Police Officer. SRT team broke down the locked front door of Santana's residence with a police instrument, a Halligan bar. None of

the SRT officers knocked or announced their presence so as to alert the occupants of the Santana home. Once the SRT officers were inside, the lead SRT officer stood in the foyer with a pistol in hand and ordered 27-year-old Santana to get on the ground. **As Santana complied with the commands and was lowering his body to get on his knees, the lead SRT officer shot Santana three times, killing him.** *Santana v. Miami-Dade Cnty.*, No. 1:14-cv-20840-UU (S.D. Fla. 2014) [D.E. 1].

l.   **Santiago, Julio Angel - Date of Incident: February 8, 2012.**
Just after 8:00 p.m., Santiago was **on his way home from work** when a Miami Beach Police Officer working with a Miami-Dade County **Robbery Intervention Detail (RID) Officer shot and killed him**. There was a report of gunfire in the area, and a RID officer saw an SUV speeding away from the area. There was a short chase, and Santiago stopped and exited the vehicle. The RID officers observed Santiago under a bush **unarmed**, then shot and killed him. Emergency medical assistance was withheld. *Delgado v. Miami-Dade Cnty.*, No. 14-003530-CA-01 (Fla. 11th Cir. Ct. 2014) [Filing # 10052983]; *Family Of Man Shot by Police Want Answers*, CBSMiami News, Feb. 9, 2012, http://miami.cbslocal.com/2012/02/09/family-of-man-shot-by-police-want-answers/.

li.   **Scruggs, Brian  - Date of Incident: October 11, 2001.**
Three unmarked and plains clothes **Robbery Intervention Detail (RID) Miami-Dade County Police Officers** boxed in 39-year-old Theodore Dukes' Honda Civic car with he and two other occupants after they had left a local store and made a purchase. They were not involved in any criminal activity. The occupants of the car feared for their lives and that they were being carjacked, so the driver sped away.

The RID officers shot two of the occupants of the vehicle, including Scruggs, and then the driver tried to make his way to Jackson Memorial Hospital when he saw blue lights following them. The driver stopped the car, and Scruggs exited with his hands up. A **RID officer slammed Scruggs to the ground and then beat Scruggs with the butt of his gun**. As Scruggs was lying on the ground, he continued to be struck by RID officers even though he was not resisting. *Dukes v. Miami-Dade Cnty.*, No. 1:05-cv-22665-PCH (S.D. Fla. 2005) [D.E. 1].

lii.   **Smith, Lynn - Date of Incident: October 11, 2001.**

Three unmarked and plains clothes **Robbery Intervention Detail (RID) Miami-Dade County Police Officers** boxed in 39-year-old Theodore Dukes' Honda Civic car with he and two other occupants after they had left a local store and made a purchase. They were not involved in any criminal activity. The occupants of the car feared for their lives and that they were being carjacked, so the driver sped away. The RID officers shot two of the occupants of the vehicle so the driver tried to make his way to Jackson Memorial Hospital and then saw blue lights following them. The driver stopped the car, and Smith exited with her hands up. A RID officer charged the surrendering Smith and without justification or any resistance from Smith, slammed Smith to the ground with great force and placed her knees into Smith's back, causing Smith to cry out in pain. *Dukes v. Miami-Dade Cnty.*, No. 1:05-cv-22665-PCH (S.D. Fla. 2005) [D.E. 1].

liii.   **Suarez-Reyes, Alexis - Date of Incident: November 27, 2012.**

Suarez-Reyes was **shot in the head and killed by Miami-Dade County Police Officers**. Suarez-Reyes worked as a subcontracted, **unarmed** security guard at Miami International Airport. He was the subject of an investigation into a fight that had allegedly occurred at the

airport. Miami-Dade County Police Officers **followed Suarez-Reyes in an unmarked vehicle** to his apartment to serve an arrest warrant for aggravated battery. **Suarez-Reyes was in his vehicle and was shot five times**. His stepdaughter stated, **"He didn't even get the chance to do anything or get out of his car,"** and **"They didn't even scream at him. I did film some of the scene with my telephone, but the cops took it away from me."** Peter D'Oench, *Cops: Fight At Airport Led To Tuesday's Police-Involved Shooting*, CBSMᴵᴬᴹᴵ Nᴇᴡs, Nov. 28, 2012, http://miami.cbslocal.com/2012/11/28/victim-identified-in-tuesdays-police-involved-shooting/ (emphasis added); David Ovalle, *High-profile Miami police shooting still under investigation, five years later*, Tʜᴇ Mɪᴀᴍɪ Hᴇʀᴀʟᴅ, Apr. 10, 2015, http://www.miamiherald.com/news/local/community/miami-dade/article18215174.html.

liv. **Thomas, Yolanda - Date of Incident: January 4, 2013.**
Miami-Dade County Police Officers fired multiple rounds into a vehicle after a high-speed chase following a report of a shoplifting of makeup from a CVS store. Once the vehicle in which Thomas was riding crashed, the officers began firing at the car and shot the helpless, injured occupants in the vehicle, including Thomas. Thomas died at the scene from multiple gunshot wounds. Another occupant of the vehicle, Xavier Johnson, was also shot and died a few hours later at Kendall Regional Medical Center. *Whitaker v. Miami-Dade Cnty.*, No. 1:13-cv-24450-LENARD/O'SULLIVAN (S.D. Fla. 2013) [D.E. 23].

lv. **Thomson, Lisa - Date of Incident: November 19, 2005.**
24-year-old Thomson was tasered when she would not sign a **fraudulent ticket** written by a Miami-Dade County Police Officer. Thomson was stopped because the officer suspected that Thomson

was driving under the influence of alcohol. Thomson passed all sobriety tests performed by the officer and was found <u>not</u> to be under the influence, so the officer instead attempted to give Thomson a ticket for speeding and having no vehicle registration. However, Thomson told the police that she did have registration and refused to sign a fraudulent ticket. Thomson then called her mother for help. While attempting to place the call, the officer pointed his Taser at her and ordered her to sign the ticket or get out of the car. Before she could get out of the car, however, the officer fired his **Taser three times, striking her each time in the area of her left breast**. Thomson lost consciousness because of the Taser. Thomson's mother remained on the phone during the tasing and heard her daughter screaming in pain. Thomson was then taken to Ward D, the locked-down section of Jackson Memorial Hospital where inmates are treated for in-patient care and then taken to be booked into custody. **False charges of battery on a law enforcement officer and resisting arrest** were filed against Thompson and ultimately dismissed. *Thompson v. Miami-Dade Cnty.*, No. 09-21708-CV-OLD/MCALILEY (S.D. Fla. 2009) [D.E. 29].

lvi. **Urruchaga, Jose - Date of Incident**: **May 4, 1999.**

Urruchaga was one of two friends who were law-abiding citizens who were carjacking hostages. Urruchaga's friend had reported to police that they were carjacking hostages and in the back of the subject vehicle. Urruchaga was **shot five times in his back** by Miami-Dade County Police Officers. After the officers shot Urruchaga, they pulled Urruchaga's bullet-ridden body from the back seat of the vehicle, beat him, and called him a "dog," all purportedly under the belief that he was a suspect. All occupants of the vehicle, the law-abiding citizens who were carjacking hostages and the suspects, were **unarmed**. *Urruchaga v. Miami-Dade Cnty.*, No. 00-026280-CA-01 (Fla. 11th Cir.

Ct. 2000); Dana Calvo, *Carjacking Victim Recalls Terror*, The Sun Sentinel, May 4, 1990, http://articles.sun-sentinel.com/1999-05-04/news/9905040146_1_carjacking-miami-dade-police-officers.

lvii.    **Valdes, Eloy - Date of Incident: February 21, 2008.**

Miami-Dade County Police Officers arrested Valdes for a misdemeanor. While being arrested, Valdes expressed his dissatisfaction with being arrested. Suddenly, a trio of **plainclothes Miami-Dade County Police Officers grabbed Valdes and rushed him into the elevator**. Two of the Miami-Dade County Police Officers **grabbed Valdes' head and pushed it against the elevator wall and threatened him**. Once inside the interview room, which was not the correct process for Valdes' arrest, the officers **pushed Valdes onto the floor and began kicking him all over**. While the officers were beating him, Valdes curled into a fetal position to protect himself. Valdes never physically resisted or threatened the officers. Valdes sustained bruising, burns and lacerations about his body. *Valdes v. Miami-Dade Cnty.*, No. 12-06510-CA-9 (Fla. 11th Cir. Ct. 2012) [D.E. 1-2].

lviii.    **Washington, David - Date of Incident: March 22, 2010.**

Washington was in the front yard of his home when a Miami-Dade County Police Officer entered the front yard and charged at him. The officer struck Washington with his fist, pinned him down, and beat him. Other Miami-Dade County Police Officers joined in and began beating Washington. When Washington was lying face down, one of the Miami-Dade County Police Officers **shot Washington twice in the back with a Taser**. Washington suffered injuries to his face, head, shoulders, and back. *Washington v. Miami-Dade Cnty.*, No. 1:12-cv-21255-FAM (S.D. Fla. 2012) [D.E. 1].

lix.   **Williams, Timmie - Date of Incident: July 15, 2012.**

Miami-Dade County Police Officers responded to a call regarding a fight at a neighborhood party. When an officer arrived, Williams was standing in the driveway of the family home. When the officer stepped out of his police vehicle, he approached the area where Williams was located, pulled out his police weapon, and opened fire. The officer struck Williams with bullets and kept shooting until Williams died on the scene. At the time Williams was shot, he was **unarmed** and posed no danger, imminent or otherwise, to the officer or anyone else. *Williams v. Miami-Dade Cnty.*, No. 14-946-CA-15 (Fla. 11th Cir. Ct. 2014) [Filing # 14715267]; Gilma Avalos, *Police-Involved Shooting Leaves One Dead in Miami-Dade*, NBCMIAMI NEWS, July 15, 2012, http://www.nbcmiami.com/news/local/Police-Involved-Shooting-Leaves-One-Dead-in-North-Miami-162508106.html.

lx.   **Wimbley, Michael Anthony - Date of Incident**: before 2004.

Wimbley was covered in blood from head to toe after Miami-Dade County Police Officers arrested him. During his arrest, Wimbley suffered a laceration to his head, which required sutures, a swollen and bruised left eye, a bruised face, and upper back pain. At his criminal trial, Judge Levy determined that Miami-Dade County Police Officers had no probable cause to arrest Wimbley, and all criminal charges against Wimbley were dismissed. Miami-Dade County paid Wimbley to settle his claim for excessive use of force. *See* Affidavit of Kenneth Harms, *Perez v. Miami-Dade Cnty.*, No. 97-1915-CIV (S.D. Fla. 2004), *available at* 2004 WL 3607625.

(f)   The failure to take appropriate action after having actual or subjective knowledge of excessive force complaints and contact homicide shootings by Miami-

Case 1:14-cv-23285-FAM   Document 89   Entered on FLSD Docket 10/03/2016   Page 54 of 74

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 54

Dade Police Department RID officers, including without limitation those set forth in paragraph 42, and for at least four years prior to the date of the deadly force shooting of David Alexis and that the conduct had continued throughout the years of 2008 through 2012 preceding the excessive and deadly force shooting of David Alexis on October 2, 2012 by multiple RID officers, including without limitation, MIGUEL CARBALLOSA, Kelvin Cox, Corey Thomas, Joseph Nagy, Manuel Regueiro, Anthony Rodriguez, James Johns, and Martin Amaran;

(g)     The failure to create and have in place a Civilian Investigative Panel with subpoena power or any other independent entity with subpoena power to address the known concern of the use of unlawful, excessive, and deadly force by Miami-Dade Police Department officers;

(h)     The failure to implement the use of body cameras on Miami-Dade Police Department officers to prevent the illegal process commonly known as "Walt Disney the facts" so that the incident and investigation reports would be framed in such a way to exculpate any wrongdoing by any police officer, including wrongdoing in the use of unlawful, excessive, and deadly force;

(i)     The failure to take appropriate action after having subjective or actual knowledge of the incidents set forth herein in paragraph 42, that Miami-Dade Police Officers were the subject of 1,309 complaints of excessive and/or deadly force from 1990 through 2002, approximately 1,000 complaints of excessive and/or deadly force from 2002 through 2010, and 12 complaints of excessive force against OFFICER

CARBALLOSA over a five-year period resulting in absolutely no adverse consequences to OFFICER CARBALLOSA;

(j)    The failure to take appropriate action after having subjective or actual knowledge of the racial profiling of young black males, such as David Alexis, by Miami-Dade Police Officers;

(k)    The failure to take appropriate action after having subjective or actual knowledge of many excessive and deadly force complaints filed against Miami-Dade Police Department officers, including without limitation those set forth in paragraph 42 and those on file with the Miami-Dade County Risk Management Department for many years prior to 2012 involving incidents of injuries and death that were disproportionate to the severity of the crime alleged or where no crime was alleged or had been committed;

(l)    Consistent acceptance of police officer testimony over the testimony of complainants and non-party witnesses so as to render any purported "investigation" a sham or facade;

(m)    The failure to adequately enforce any written guidelines for the use of excessive force and deadly force;

(n)    The failure to take appropriate action after having subjective or actual knowledge of the number of Miami-Dade Police officer involved shootings, beatings, and other uses of excessive force by Miami-Dade Police officers prior to October 2, 2012, including without limitation, the many prior incidents and complaints of excessive force and a prior contact homicide shooting by OFFICER CARBALLOSA, such that

Miami-Dade Police officer involved shootings, beatings and other uses of excessive force became a widespread epidemic;

(o)     By sworn testimony of former Mayor Carlos Alvarez, MIAMI-DADE COUNTY would have had a "meaningless" policy of officer discipline when officers who had sustained complaints of excessive force filed against them received no discipline;

(p)     In 2002, United States Representative John Conyers determined that the Miami-Dade Police Department had a disturbing pattern of excessive force used against black men; and,

(q)     In June 2005, Police Officer C. McKinnon **shot in the back** and killed Rudy Morris, an **unarmed** black man, and despite Judge William Thomas' ruling in March 2011 that Officer McKinnon violated Mr. Morris' Fourth Amendment rights when he was **unarmed, running away and shot in the back**, Officer McKinnon was not terminated by MIAMI-DADE COUNTY for her actions.

43.     MIAMI-DADE COUNTY's official and final policy makers have repeatedly ratified and endorsed the continued violations of the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution by its police officers, have repeatedly tolerated the continued use of unlawful, excessive and deadly force by members of the Miami-Dade Police Department, have repeatedly ignored the hundreds of complaints of excessive and deadly force, and failed to impose any meaningful reform on the use of excessive and deadly force by its police officers.  The use of unlawful, excessive and deadly force, described above, has deprived citizens of their constitutional rights and privileges, including without limitation, the right and privilege not

to be deprived of their life and liberty without due process of and equal protection of the law; the right and privilege to be free from an unlawful attack upon the physical integrity of his person; the right and privilege to be secure in his person while in the custody of police officers; the right and privilege not to be subjected to punishment without due process of the law; the right and privilege to be free from cruel and unusual punishment; and the right to be free from unreasonable search and seizure, illegal assault and illegal battery.

44.    From the 1990s through 2012, MIAMI-DADE COUNTY's official and final policymakers had subjective and actual notice of the need for appropriate training and re-training in the use of excessive and deadly force by virtue of fatal and non-fatal shootings, the unlawful use of conducted electrical weapons or Taser-related deaths, civilian complaints, state attorney inquiries, wrongful death claims, other civil lawsuits, as well through information, communications, documentation, and proceedings as set forth herein, and in particular in paragraph 42 (i) through (lx), and yet MIAMI-DADE COUNTY made deliberate choices not to provide any meaningful reform.

45.    Said unofficial policies, customs and practices described herein were so widespread and well settled within MIAMI-DADE COUNTY that they constituted custom and usage with the force of law.

46.    The above described unofficial policies, practices and customs permitting and tolerating the use of unlawful, excessive and deadly force, inadequately investigating citizen complaints, and failing to properly train, retrain and supervise Miami-Dade Police Department officers were instituted with deliberate indifference by

the official and final policymakers of MIAMI-DADE COUNTY to their known or obvious consequences, including without limitation, the continued use of unlawful, excessive and deadly force by Miami-Dade Police Department officers such as occurred when David Alexis was shot in the back and killed on October 2, 2012, and thus, were the moving force of the depravation of the constitutional rights of David Alexis and thereby led to or were the cause of the death of David Alexis.

47.     As a direct and proximate result of the unofficial customs, practices and/or unofficial de facto policies of MIAMI-DADE COUNTY and their official and final policymakers as set forth herein, David Alexis suffered violation of his constitutional rights under the Fourth, Fifth, Eighth and Fourteenth Amendments, (i) to be free from an unreasonable search and seizure of the person; (ii) loss of physical liberty; (iii) to be free from cruel and unusual punishment; (iv) equal protection under the law or due process; and (v) assault and battery or severe bodily injury resulting in his death on October 2, 2012.

48.     The actions of MIAMI-DADE COUNTY, by and through their official and final policy makers as set forth herein, violated the following clearly established and well settled constitutional rights of David Alexis:

(a)     Freedom from unreasonable search and seizure of his person;

(b)     Freedom from the use of excessive, deadly, unreasonable, and unjustified use of force against his person;

(c)     Freedom from cruel and unusual punishment; and

(d)     Equal protection under the law or due process.

49.     Plaintiff, Trudy Mighty, as the Personal Representative of the Estate of David Alexis, is entitled to recover damages on behalf of David Alexis' minor child and David Alexis' Estate, flowing from the deprivations of David Alexis' constitutional rights including those under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution.

50.     The actions alleged herein directly and proximately resulted in bodily injury, pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the incurring of funeral expenses, and lost earnings.  These losses are permanent in nature.

51.     As a direct and proximate result of Defendants' acts and omissions as described herein, David Alexis' minor child and David Alexis' Estate sustained damages, including without limitation, the past and future mental pain and suffering of David Alexis' surviving minor daughter, Teyliah Alexis; the loss of the care, maintenance, companionship, instruction, guidance, advice, counsel, inheritance, and other reasonable contributions of pecuniary and non-pecuniary value that David Alexis' surviving minor daughter, Teyliah Alexis, would have otherwise received during the decedent's life had it not been for his untimely, tragic, and wrongful death; expenses of medical care and funeral arrangements arising from the injury and death of David Alexis; the loss of the estate's prospective net accumulations; and loss of inheritable estate.

---

### COUNT II  (42 U.S.C. §1983 Claim)
### OFFICER CARBALLOSA

52.     Plaintiff re-alleges paragraphs 1, 3 through 6, 8, 10 through 28, 31 and 32, inclusive, as if set forth herein and further alleges as follows.

53.     This action is brought against Miami-Dace Police Department OFFICER CARBALLOSA for the excessive use of force under color of the law that deprived David Alexis of his constitutionally protected rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and the comparable provisions of the Florida Constitution.

54.     At all relevant times, Defendant, OFFICER CARBALLOSA, was acting within the course and scope of his employment as a police officer of the Miami-Dade Police Department and acting under color of law.

55.     The shooting of David Alexis was the result of conduct that was recklessly, maliciously, or deliberately indifferent to David Alexis in depriving him of his constitutional rights.

56.     Defendant, OFFICER CARBALLOSA, acting under color of the law, deprived David Alexis of the rights and privileges secured to him by the United States Constitution, including the right not to be deprived of his liberty without due process of law and his right to be free from unreasonable searches and seizures of his person, under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 61

57.    Defendant, OFFICER CARBALLOSA's conduct failed to adhere to constitutional standards on the use of force by a law enforcement officer under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

58.    Defendant, OFFICER CARBALLOSA's conduct violated clearly established and well-settled Federal and Florida constitutional rights belonging to David Alexis.

59.    David Alexis was shot and killed by OFFICER CARBALLOSA while standing outside of his car, unarmed, in front of his parents' home. David Alexis did not pose an imminent threat of death or serious physical injury to the officers or to the public. Without legal cause or justification, OFFICER CARBALLOSA employed deadly force and shot David Alexis. In shooting and killing David Alexis, OFFICER CARBALLOSA used force that was excessive, unnecessary, and disproportionate to that force necessary to detain, arrest, or subdue David Alexis.

60.    The deprivation of constitutional rights was proximately caused by MIAMI-DADE COUNTY:

(a)    In having a policy and/or custom and practice that directs police officers that deadly force may be used, in the absence of the constitutionally required existence of objective probable cause;

(b)    In having a policy and/or custom and practice of ratifying and approving unreasonable shootings of persons by MIAMI-DADE COUNTY Police Officers, without implementing methods and training necessary to prevent such shootings;

(c)      In having a policy and/or custom and practice of failing to discipline police officers who use deadly force improperly and who unreasonably shoot persons; and

(d)      In failing to properly train police officers in the proper and legal use of deadly force.

61.    The actions of OFFICER CARBALLOSA were not objectively reasonable under the circumstances, and thus, they were not protected by the doctrine of qualified immunity, or any other immunity.

62.    The actions, as alleged herein, of OFFICER CARBALLOSA directly and proximately resulted in bodily injury, pain, suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, the incurring of funeral expenses, and lost earnings.  These losses are permanent in nature.

63.    As a direct and proximate result of the actions of OFFICER CARBALLOSA, David Alexis died on October 2, 2012.

64.    As a direct and proximate result of Defendants' acts and omissions as described herein, Plaintiff, Trudy Mighty, as the Personal Representative for the Estate of David Alexis, sustained damages, including without limitation, the past and future mental pain and suffering of David Alexis' surviving minor daughter, Teyliah Alexis; the loss of the care, maintenance, companionship, instruction, guidance, advice, counsel, inheritance, and other reasonable contributions of pecuniary and non-pecuniary value that David Alexis' surviving minor daughter, Teyliah Alexis, would have otherwise received during the decedent's life had it not been for his untimely, tragic, and wrongful death; expenses of medical care and funeral arrangements arising from the injury and

death of David Alexis; the loss of the estate's prospective net accumulations; and loss of inheritable estate.

### COUNT III (Wrongful Death)
### MIAMI-DADE COUNTY

65.     Plaintiff re-alleges paragraphs 3 through 6, 10 through 13, and 16 through 20, inclusive, as if set forth herein, pleads in the alternative, and further alleges as follows.

66.     This action for money damages in excess of $75,000.00 is brought against MIAMI-DADE COUNTY by Plaintiff, Trudy Mighty, as the Personal Representative for the Estate of David Alexis, under Florida law that holds a government entity liable for the negligence and other wrongful acts of its employees and agents acting within the course and scope of their employment and/or agency.

67.     This claim is brought pursuant to the Florida Wrongful Death Act, and in the alternative to other counts alleged herein.

68.     The acts of MIAMI-DADE COUNTY by and through its agents, servants, employees, OFFICER CARBALLOSA and other Miami-Dade County Police Officers at or near the scene of the subject fatal shooting, were committed within the scope of their employment, in furtherance of the interests of MIAMI-DADE COUNTY, were operational in nature, but not willful, wanton, committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard for human rights, safety or property.

69.     Pursuant to § 768.28(6), Florida Statutes, Plaintiff has presented this claim in writing to MIAMI-DADE COUNTY and Miami-Dade Police Department, neither of

which made a final disposition of the claim within six months of receipt. That failure is deemed a denial for purposes of the applicable statute.

70.     All conditions precedent to the filing of this action have been met by Plaintiff or have been waived by MIAMI-DADE COUNTY.

71.     On the evening of October 2, 2012, David Alexis arrived home from work, OFFICER CARBALLOSA, and other Miami-Dade Police officers were at or near the scene of the subject fatal shooting, OFFICER CARBALLOSA was conducting surveillance near David Alexis' parents home where David Alexis lived.

72.     At all times material hereto, on October 2, 2012, OFFICER CARBALLOSA and other Miami-Dade Police Officers performed discretionary functions or actions in deciding to conduct surveillance near David Alexis' home, to engage and communicate with David Alexis; OFFICER CARBALLOSA decided to remove himself from his unmarked white pick-up truck to assess reasonable suspicion and/or probable cause, subdue, detain, and/or to constitutionally arrest David Alexis, and OFFICER CARBALLOSA, placed David Alexis in a foreseeable zone of risk. Thus, OFFICER CARBALLOSA owed a duty to exercise reasonable care in the operational use of his vehicle and firearm at or about the time that David Alexis was shot and killed. These operational uses include without limitation: not utilizing a police light in or on the unmarked pick-up truck to alert David Alexis there was a police officer(s) in an unmarked vehicle; not wearing uniform(s) with white identifying marks of "POLICE" while seated and when exiting the unmarked pick-up truck; dressed in black; deciding to involve David Alexis in an unlawful and unwarranted engagement by remaining in the

area in his unmarked pick-up truck, rather than leave so David Alexis, who was not under surveillance, was not being watched, and was not under suspicion of any crime, could maneuver his vehicle into the driveway of his parent's home without striking the unmarked pick-up truck; not properly handling police firearm(s); and, fatally shooting David Alexis.

73.    At all times material hereto, OFFICER CARBALLOSA and the other Miami-Dade County Police Officers at or near the scene of the subject fatal shooting knew or should have known that failing to properly handle the unmarked vehicle, properly handle police firearm(s), or making negligent decisions to utilize firearm(s) would result in serious injury and/or death to David Alexis.

74.    On the evening of October 2, 2012, OFFICER CARBALLOSA and the other Miami-Dade County Police Officers at or near the scene of the subject fatal shooting breached their duty to David Alexis in ways, which, include without limitation: (i) the failure to properly and safely handle firearm(s); (ii) the careless and negligent use of firearm(s), (iii) the failure to properly and safely operate the unmarked pick-up truck; (iv) the failure to provide the proper and necessary identification before deciding to shoot and kill David Alexis; (v) the unwarranted and illegal decision to negligently approach and engage David Alexis with a firearm; (vi) the improper decision to safely utilize a police light to identify the police presence in the area; and, (vii) negligently killing David Alexis.

75.     As a direct and proximate result of the negligence of OFFICER CARBALLOSA and the other Miami-Dade County Police Officers at or near the scene of the subject fatal shooting, as alleged herein, David Alexis died on October 2, 2012.

76.     As a direct and proximate result of the death of David Alexis, his minor child and his Estate suffered damages, including without limitation, the past and future mental pain and suffering of David Alexis' surviving minor daughter, Teyliah Alexis; the loss of the care, maintenance, companionship, instruction, guidance, advice, counsel, inheritance, and other reasonable contributions of pecuniary and non-pecuniary value that David Alexis' surviving minor daughter, Teyliah Alexis, would have otherwise received during the decedent's life had it not been for his untimely, tragic, and wrongful death; expenses of medical care and funeral arrangements arising from the injury and death of David Alexis; the loss of the estate's prospective net accumulations; and loss of inheritable estate.

### COUNT IV (Wrongful Death)
### OFFICER CARBALLOSA

77.     Plaintiff re-alleges paragraphs 1 through 6, 8, and 10 through 32, inclusive, as if set forth herein and further alleges as follows.

78.     This action is brought against MIAMI-DADE COUNTY by Plaintiff, Trudy Mighty, as the Personal Representative for the Estate of David Alexis under Florida law that holds a government entity liable for the negligence and other wrongful acts of its employees and agents acting within the course and scope of their employment and/or agency.

79.     Pursuant to § 768.28(6), Florida Statutes, Plaintiff has presented this claim in writing to MIAMI-DADE COUNTY and Miami-Dade Police Department, neither of which made a final disposition of the claim within six months of receipt. That failure is deemed a denial for purposes of the statute.

80.     All conditions precedent to filing this action have been met by Plaintiff or have been waived by MIAMI-DADE COUNTY.

81.     Defendant, OFFICER CARBALLOSA, was acting within the course and scope of his employment as a Miami-Dade Police Officer when he shot and killed David Alexis on October 2, 2012. MIAMI-DADE COUNTY is responsible for the actions of police employees while engaged within the course and scope of their employment.

82.     Defendant, OFFICER CARBALLOSA placed David Alexis in a foreseeable zone of risk and thus owed David Alexis the duty to exercise reasonable care in the use of a firearm once having undertaken action to subdue, detain, confront and/or David Alexis.

83.     Defendant, OFFICER CARBALLOSA, negligently discharged his firearm, shooting and killing David Alexis while he stood outside of his car, in front of his parents' home. The shooting and unlawful detention of David Alexis constituted excessive force and was accomplished without the consent and against the will of David Alexis.

84.     Defendant, OFFICER CARBALLOSA, breached the duty owed to David Alexis when he failed to adhere to accepted law enforcement standards and practices for the use of a firearm when detaining a subject.

85.     As a direct and proximate result of the actions of OFFICER CARBALLOSA, for which MIAMI-DADE COUNTY and the Miami-Dade Police Department are responsible, David Alexis died on October 2, 2012.

86.     As a direct and proximate result of Defendants' acts and omissions as described herein, Plaintiff, Trudy Mighty, as the Personal Representative for the Estate of David Alexis, sustained damages, including without limitation, the past and future mental pain and suffering of David Alexis' surviving minor daughter, Teyliah Alexis; the loss of the care, maintenance, companionship, instruction, guidance, advice, counsel, inheritance, and other reasonable contributions of pecuniary and non-pecuniary value that David Alexis' surviving minor daughter, Teyliah Alexis, would have otherwise received during the decedent's life had it not been for his untimely, tragic, and wrongful death; expenses of medical care and funeral arrangements arising from the injury and death of David Alexis; the loss of the estate's prospective net accumulations; and loss of inheritable estate.

### COUNT V (Negligent Failure to Train)
### MIAMI-DADE COUNTY

87.     Plaintiff re-alleges paragraphs 3 through 6, 10 through 13, and 16 through 20, inclusive, as if set forth herein, pleads in the alternative, and further alleges as follows.

88.     This action for money damages in excess of $75,000.00 is brought against MIAMI-DADE COUNTY by Plaintiff, Trudy Mighty, as the Personal Representative for the Estate of David Alexis, under Florida law that holds a government entity liable for

the negligence and other wrongful acts of its employees and agents acting within the course and scope of their employment and/or agency.

89.     This claim is brought in the alternative to other counts alleged herein.

90.     The acts of MIAMI-DADE COUNTY by and through its agents, servants, employees, who were supervisors of OFFICER CARBALLOSA, were committed within the scope of their employment, in furtherance of the interests of MIAMI-DADE COUNTY, were operational in nature, but not willful, wanton, committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard for human rights, safety or property.

91.     Pursuant to § 768.28(6), Florida Statutes, Plaintiff has presented this claim in writing to MIAMI-DADE COUNTY and Miami-Dade Police Department, neither of which made a final disposition of the claim within six months of receipt.  That failure is deemed a denial for purposes of the applicable statute.

92.     All conditions precedent to the filing of this action have been met by Plaintiff or have been waived by MIAMI-DADE COUNTY.

93.     At all times material hereto, Miami-Dade Police Department supervisors of OFFICER CARBALLOSA and OFFICER CARBALLOSA, were acting within the course and scope of their employment as Miami-Dade Police Department officers.

94.     On the evening of October 2, 2012, David Alexis, a 26-year-old man of Haitian descent, arrived at his parent's home after his shift at North Shore Hospital, where he had worked as a transporter for over five years.

95.    At that time and place, OFFICER CARBALLOSA, was sitting in his parked, unmarked pick-up truck, in plain clothes, and purportedly conducting surveillance near the home of David Alexis' parents.  The surveillance was not related in any way, shape, or form to David Alexis or any member of his family.

96.    On the night of October 2, 2012, no Miami-Dade Police Department officer suspected David Alexis of any crime.

97.    At that time and place, OFFICER CARBALLOSA decided to exit his unmarked pick-up truck, and kill David Alexis by shooting him in the back as he attempted to get into his parent's home.

98.    From 2005 through 2013, there were 12 complaints against or use of excessive force investigations by the Miami-Dade Police Department of OFFICER CARBALLOSA, including three fatal contact homicide shootings, none of which resulted in any training or retraining to OFFICER CARBALLOSA by the Miami-Dade Police Department.  One of these complaints occurred in 2011 when OFFICER CARBALLOSA committed a contact shooting homicide, almost one year before he shot and killed David Alexis, and the investigation of the 2011 homicide was still ongoing as of the date of the fatal shooting of David Alexis on October 2, 2012.

99.    Defendant MIAMI-DADE COUNTY owed David Alexis, a citizen of MIAMI-DADE COUNTY, a duty of care that Miami-Dade Police Department supervisors would adequately train and supervise Miami-Dade Police Department officers, including OFFICER CARBALLOSA, in the appropriate and proper operational procedures for: undercover work; plain clothes operations; communicating with citizens such as David

Alexis during ongoing undercover work and plain clothes operations; conducting surveillance with and without a partner; making arrests; using firearms when arresting an individual; enforcement profiling; properly discharging a firearm against citizens; properly using deadly force; the requirement of cessation of the use of deadly force when there is clearly no threat to an officer or the Miami-Dade Police Department; officer tracking; stopping; detaining; and taking individuals into custody.

100.   MIAMI-DADE COUNTY breached its duty of care to David Alexis in its policy decisions in failing to conduct appropriate training and supervision of OFFICER CARBALLOSA, including training in the appropriate operational procedures for: undercover work; plain clothes operations; communicating with citizens such as David Alexis during ongoing undercover work and plain clothes operations; conducting surveillance with and without a partner; making arrests; using firearms when arresting an individual; enforcement profiling; use of a police light; properly discharging a firearm against citizens; properly using deadly force; not to be an aggressor in communication with citizens who are not suspected of any crime and trying to get into their home; the requirement of cessation of the use of deadly force when there is clearly no threat to an officer or the Miami-Dade Police Department; officer tracking; stopping; detaining; and taking individuals into custody.

101.   MIAMI-DADE COUNTY's failure to adequately train or retrain and adequately supervise OFFICER CARBALLOSA in operational Miami-Dade Police Department procedures, as described above in paragraph 100 above, led to OFFICER CARBALLOSA's unlawful and unwarranted encounter with and shooting of David Alexis

on the night of October 2, 2012, thereby causing or substantially contributing to the death of David Alexis on October 2, 2012.

102.   As a direct and proximate result of Defendants' acts and omissions, as alleged herein, David Alexis' minor child and David Alexis' Estate sustained damages, including without limitation, the past and future mental pain and suffering of David Alexis' surviving minor daughter, Teyliah Alexis; the loss of the care, maintenance, companionship, instruction, guidance, advice, counsel, inheritance, and other reasonable contributions of pecuniary and non-pecuniary value that David Alexis' surviving minor daughter, Teyliah Alexis, would have otherwise received during the decedent's life had it not been for his untimely, tragic, and wrongful death; expenses of medical care and funeral arrangements arising from the injury and death of David Alexis; the loss of the estate's prospective net accumulations; and loss of inheritable estate.

## **DEMAND FOR JUDGMENT AND JURY TRIAL**

WHEREFORE, Plaintiff, TRUDY MIGHTY, as Personal Representative of the Estate of David Alexis, on behalf of the estate, and the decedent's sole surviving minor daughter, Teyliah Alexis, hereby demands judgment for damages against Defendants, MIAMI-DADE COUNTY and MIGUEL CARBALLOSA, including without limitation, past and future mental pain and suffering of the decedent's surviving minor daughter, Teyliah Alexis; the loss of the care, maintenance, companionship, instruction, guidance, advice, counsel, inheritance, and other reasonable contributions of pecuniary and non-pecuniary value that the surviving minor daughter would have otherwise received during

the decedent's life had it not been for his untimely, tragic, and wrongful death; expenses

of medical care and funeral arrangements arising from the decedent's injury and death;

the loss of the estate's prospective net accumulations; and loss of inheritable estate.

Plaintiff seeks punitive damages against Defendant MIGUEL CARBALLOSA.

In addition, Plaintiff seeks attorney's fees and costs pursuant to 42 U.S.C. §1988,

along with interest and costs, and such other relief as this Court deems just and proper.

Plaintiff further demands trial by jury.

Dated this 3rd day of October, 2016.

**DLD LAWYERS**
Attorneys for Plaintiff
Douglas Entrance
806 Douglas Road, 12th Floor
Coral Gables, Florida 33134
Tel.: (305) 443-4850
Fax: (305) 443-5960
www.dldlawyers.com

BY:  /s/ *Frank L. Labrador*

FRANK L. LABRADOR
Fla. Bar No.: 796980
flabrador@dldlawyers.com
MARY MARGARET SCHNEIDER
Fla. Bar No.: 614009
mmschneider@dldlawyers.com
PETE L. DEMAHY
Fla. Bar No.: 241822
pdemahy@dldlawyers.com
DANIELA ABRATT
Fla. Bar No.: 118053
dabratt@dldlawyers.com

*Estate of Alexis v. Miami-Dade County, et al.*
USDC - Southern District of Florida
Case No.: 1:14-cv-23285-CIV-MORENO/O'SULLIVAN
Page 74

---

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of October, 2016, a true and correct copy of the foregoing was served by electronic filing on all counsel or parties of record on the Service List below.

BY:  /s/ *Frank L. Labrador*

FRANK L. LABRADOR
FLA. BAR NO.: 796980
flabrador@dldlawyers.com

### SERVICE LIST

**Attorneys for Defendants, Miami-Dade County and Miguel Carballosa**
Ana Angelica Viciana
Annery Pulgar Alfonso
Kathleen Walsh
Bernard Pastor
Miami-Dade County Attorney's Office
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
Telephone: (305) 375-5151
Fax: (305) 375-5634
E-mail: anita@miamidade.gov
annery@miamidade.gov
klw@miamidade.gov
pastor@miamidade.gov

**Appellate Counsel for Plaintiff, Trudy Mighty**
Roy D. Wasson
Wasson & Associates, Chartered
Courthouse Plaza, Suite 600
28 West Flagler Street
Miami, FL 33130
Telephone: (305) 372-5220
Fax: (305) 372-8067
E-mail: roy@wassonandassociates.com